In re BIOSCRIP, INC. SECURITIES LITIGATION.

No. 13–cv–6922(AJN).

United States District Court,
S.D. New York.

Signed March 31, 2015.

714

Evan M. Berkow, Gerald H. Silk, Hannah Elizabeth Ross, Jai Kamal Chandrasekhar, Bernstein Litowitz Berger & Grossmann LLP, New York, NY, for Fresno County Employees' Retirement Association.

Jeremy Alan Lieberman, Lesley Frank Portnoy, Pomerantz LLP, New York, NY, for Timothy Faig Individually and on Behalf of all Other Persons Similarly Situated.

Hannah Elizabeth Ross, Bernstein Litowitz Berger & Grossmann LLP, Curtis Victor Trinko, Law Offices of Curtis V. Trinko, LLP, New York, NY, for West Palm Beach Police Pension Fund.

Jay Philip Lefkowitz, Joseph Serino, Jr., Kirkland & Ellis LLP, Shireen Anneke Barday, USDC, Southern District of New York, New York, NY, for BioScrip, Inc., Richard M. Smith, Hai V. Tran, Patricia Bogusz, Kohlberg & Co., LLC, Myron Z. Holubiak, Charlotte W. Collins, Samuel P. Frieder, David R. Hubers, Richard L. Robbins, Stuart A. Samuels, Gordon H. Woodward, Kimberlee Seah.

Bradley Jay Butwin, Jonathan Rosenberg, Ross Bradley Galin, William Joseph Sushon, O'Melveny & Myers, LLP, New York, NY, for Jeffries LLC, Morgan Stanley & Co. LLC, Suntrust Robinson Humphrey, Inc., Dougherty & Company, Noble International Investments, Inc.

## MEMORANDUM & ORDER

ALISON J. NATHAN, District Judge:

This is a securities class action brought on behalf of all persons and entities who purchased or acquired the publicly traded common stock of BioScrip, Inc. ("BioScrip") between November 9, 2012 and November 6, 2013. The lead plaintiffs in the case are the Fresno County Employees' Retirement Association ("Fresno") and the West Palm Beach Police Pension Fund ("West Palm Beach" and, collectively with Fresno, "Plaintiffs"). Plaintiffs principally allege that BioScrip violated the securities laws through deception about two distinct areas of the Company's business—first, the failure to disclose the Government's interest in possible violations of the Anti-Kickback Statute and False Claims Act by BioScrip's specialty pharmacy division, and, second, the so-called "PBM Services Scheme," in which the Defendants allegedly withheld the fact that one of its most profitable business segments was in the process of collapsing.

Plaintiffs bring claims against two sets of Defendants. The first group,[1] subject to claims under both the Exchange Act and the Securities Act, now moves to dismiss Plaintiffs' Consolidated Class Action Complaint ("CCAC") in its entirety. *See* Dkt. No. 41. The second group of Defendants, including the BioScrip's underwriters and a number of the company's directors and officers, move to dismiss Counts III and IV of the CCAC. *See* Dkt. No. 45. For the reasons below, both motions are GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I. The Defendants

Plaintiffs bring claims against a large number of Defendants under both the Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, and the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* Defendants BioScrip, Smith, Tran, Bogusz, and Kohlberg are subject to claims under each Act.

BioScrip is a Delaware corporation with its principal place of business in Elmsford, New York. *See* CCAC ¶ 31. It provides healthcare services with a specialization in home-based medical treatments. *Id.* The company also sells prescription discount cards that allow cardholders to purchase prescription medications at discounted prices through its "PBM Services" operating segment. *Id.* For a time the company operated specialty pharmacies that provided medications intended to treat a variety of serious and chronic medical issues, including cancer, HIV/AIDS, and multiple sclerosis. *Id.* Notably for purposes of this case, BioScrip's specialty pharmacy division also sold the drug Exjade. *Id.* ¶ 38. BioScrip sold its specialty pharmacy division in May 2012. *Id.*

During the time period at issue, BioScrip's President and Chief Executive Officer was Defendant Richard M. Smith. *Id.* ¶ 32. Smith was first appointed Chief Operating Officer of BioScrip in January 2009 and was promoted to Chief Executive Officer in January 2011. *Id.* Also during the time in question, BioScrip's Senior Vice President, Chief Financial Officer and Treasurer was Defendant Hai V. Tran, who was appointed to those positions in May 2012. *Id.* ¶ 33. Defendant Patricia Bogusz was at all relevant times was the company's Vice President of Finance. *Id.* ¶ 34.

The final Defendant subject to Exchange Act claims is Kohlberg, a private-equity firm that manages and advises a number of funds, including, *inter alia*, Kohlberg Management V, L.L.C., Kohlberg Investors V, L.P., Kohlberg Partners V, L.P., Kohlberg TE Investors V, L.P., and KOCO Investors V, L.P. (collectively the "Kohlberg Funds"). *Id.* ¶ 36. The Kohlberg Funds beneficially owned, at their peak, approximately 26 percent of BioScrip's outstanding stock. Pursuant to a 2010 stockholder's agreement, Kohlberg was entitled to elect two members of BioScrip's eight-person Board of Directors. *Id.*

In addition to the Exchange Act claims brought against the aforementioned Defendants, Plaintiffs also bring claims under the Securities Act against Myron Z. Holubiak, Charlotte W. Collins, Esq., Samuel P. Frieder, David R. Hubers, Richard L. Robbins, Stuart A. Samuels, Gordon H. Woodward, and Kimberlee Seah (collectively, and in conjunction with Smith, Tran, and Bogusz, the "Individual Securities Act Defendants"). Defendant Holubiak was appointed Chairman of the Board on April 18, 2012 and was a signatory to

---

1. This includes BioScrip, Defendants Richard M. Smith, Hai V. Tran, and Patricia Bogusz (collectively the "Individual Exchange Act Defendants"), and Kohlberg & Co., LLC ("Kohlberg").

the Shelf Registration Statement at issue in this case. CCAC ¶ 261. Defendants Collins, Hubers, Robbins, Samuels are directors of BioScrip who signed the Shelf Registration Statement and the 2012 Form 10–K. Id. ¶¶ 262, 264–66. Defendants Frieder and Woodward are both officers of Kohlberg and directors of BioScrip. Id. ¶¶ 263, 267. Defendant Seah was BioScrip's Senior Vice President, Secretary, and General Counsel throughout the class period. Id. ¶ 268.

Plaintiffs also bring their Security Act claims against various underwriters of BioScrip's common stock offerings, including Jeffries LLC ("Jeffries"), Morgan Stanley & Co. LL ("Morgan Stanley"), SunTrust Robinson Humphrey, Inc. ("SunTrust"), Dougherty & Company ("Dougherty"), and Noble International Investments, Inc. ("Noble") (collectively the "Underwriter Defendants").

## II. The Alleged Kickback Scheme

From November 2005 to May 2012, BioScrip sold a pharmaceutical known as Exjade, an iron-chelation drug that helps remove iron from a patient's body. Id. ¶ 46. Exjade, which was first approved by the Food and Drug Administration ("FDA") in November 2005, is used primarily to treat patients who have had repeated blood transfusions, which can lead to a buildup of iron in the body, leading to possible liver and pancreas damage. Id.

Exjade is produced by Novartis Pharmaceuticals Corp. ("Novartis"), which first began selling the drug in 2005. Id. ¶ 47. Novartis distributed Exjade through a system known as EPASS (Exjade Patient Assistance and Support Services), which established an exclusive distribution network with consumer-facing pharmaceutical companies that would actually sell the drug to patients. Id. BioScrip was one of three pharmaceutical companies accepted into EPASS by Novartis. Id. In order for a patient to receive Exjade, a doctor would submit enrollment forms on the patient's behalf to EPASS. Id. ¶ 49. For approximately half of the Exjade prescriptions, the proscribing doctor selected which company would ultimately fill the order, while the other half of prescriptions were referred by EPASS, which was controlled by Novartis. Id.

The basic structure of the alleged Exjade kickback scheme was that in return for aggressively pushing Exjade on patients, in spite of its known severe side effects, BioScrip would receive preferential rebates and referrals from Novartis and EPASS. Id. ¶ 50. The Plaintiffs allege that, due to its side effects, Exjade was not selling as well as Novartis had hoped. Id. ¶ 52. Accordingly, in early 2007, Novartis redoubled its efforts to sell Exjade and put tremendous pressure on BioScrip to maximize the number of refill orders of the drug. Id. ¶¶ 56–57. Specifically, in February 2007, Novartis informed BioScrip that their refill rate for Exjade lagged behind the two other pharmaceutical companies in EPASS. Id. ¶ 58. Novartis placed BioScrip on a 45–day probation period from February to April 2007, during which time BioScrip was expected to significantly increase its Exjade refill rate. Id.

Because Exjade represented an exceptionally profitable product for BioScrip, the company began undertaking great efforts to bolster sales of the drug. Id. ¶¶ 56–58. This included the creation of an "Exjade Team" whose sole purpose was to promote Exjade, encourage patients to make refills, and to provide clinical counseling and support to Exjade patients. Id.

BioScrip's efforts were tremendously successful and at the end of their probationary period in April 2007 they had significantly increased their refill rate for Ex-

jade. *Id.* ¶ 70. Novartis was pleased with BioScrip's success, particularly in light of the fact that it had achieved the highest per-patient profit margin amongst the three EPASS participants. *Id.* ¶ 71. Accordingly, Novartis began offering a series of financial incentives to BioScrip, which Plaintiffs deem kickbacks, to further stimulate Exjade refills. First, in January 2008, Novartis increased the standard rebate it offered BioScrip from $13 per shipment of Exjade to $20 per shipment. *Id.* ¶ 72. Later in 2008, Novartis would again increase this rebate, this time to $30. *Id.* Second, Novartis began referring EPASS patients to the three EPASS participants based on their Exjade refill rates. *Id.* ¶ 73. In light of BioScrip's newfound success, Novartis referred approximately 60 percent of undesignated patient referrals to BioScrip in 2009. *Id.* Third, in addition to the per shipment rebates, Novartis began offering BioScrip quarterly rebates for meeting sales targets. *Id.* ¶ 74. This scheme continued until May 2012 when BioScrip sold its specialty pharmacy division, which was responsible for marketing Exjade. *Id.* ¶ 76. Notably, BioScrip's 2012 Form 10–K stated that the company retained liability for any claims stemming from the specialty pharmacy division. *Id.* ¶ 38.

In 2011, a sealed *qui tam* complaint was filed against Novartis and BioScrip, alleging that their incentive arrangements violated anti-kickback laws and the False Claims Act. *Id.* ¶ 8. The complaint initiated a joint state-federal investigation by the U.S. Attorney's Office for the Southern District of New York, the U.S. Department of Justice, the Federal Bureau of Investigation, and other state and federal agencies. *Id.* In October 2012, the United States served BioScrip with a civil investigative demand (the "CID"). This investigation ultimately culminated in the U.S. Attorney's Office for the Southern District of New York filing a complaint against, *inter alia,* BioScrip in January 2014. *Id.* ¶ 44.

The Government's interest in the arrangement between BioScrip and Novartis was due in part to the fact that a significant portion of the fees paid were reimbursed by either Medicaid or Medicare. *Id.* ¶¶ 77–79. On average, approximately one quarter to one third of BioScrip's annual revenue was derived from Medicare, Medicaid, or some other Government-funded program. *Id.* ¶¶ 80–81.

The Plaintiffs allege that over the approximately five years this arrangement was in place, BioScrip failed to disclose the true nature of its relationship with Novartis. Specifically, Plaintiffs allege that BioScrip repeatedly represented to investors and to the public that it was in compliance with relevant health care regulations, despite allegedly seeking millions of dollars in fraudulent Medicare and Medicaid reimbursements. *Id.* ¶ 84. Moreover, BioScrip did not reveal the existence of the CID until nearly a year after it was served by the Government. *Id.* ¶ 85.

The parties are in total disagreement over the significance of the CID. Plaintiffs contend the CID must have alerted BioScrip to the fact that they were under scrutiny, because, as required by statute, such demands are only served upon entities the government "has reason to believe may be in possession, custody, or control of any documentary material or information relevant to a false claims law investigation." *Id.* ¶ 87; 31 U.S.C. § 3733. Furthermore, such demands are required to "state the nature of the conduct constituting the alleged violation of a false claims law which is under investigation, and the applicable provision of law alleged to be violated." *Id.* BioScrip must have extrapolated from this information, Plaintiffs reason, that

they were likely to come under legal scrutiny.

The Plaintiffs allege that between October 2012 and September 23, 2013, the date BioScrip ultimately revealed the CID and the Government's investigation, the company made a number of false representations on public filings. One representative statement is found in their 2012 Form 10–K. BioScrip stated that:

> Governmental entities have ... commenced investigations against specialty pharmaceutical distribution companies having dealings with pharmaceutical manufacturers concerning retail distribution and sales and marketing practices of certain products and therapies. There can be no assurance that we will not receive subpoenas or be requested to produce documents in pending investigations or litigation from time to time. In addition, we may be the target or subject of one or more such investigations or named parties in corresponding actions.

CCAC ¶ 89.

On September 23, 2013, BioScrip disclosed publicly in a Form 8–K that it was the subject of a government investigation. *Id.* ¶ 91. It specifically stated that on September 11, 2013, the company had been advised by the government that it planned to initiate discussions with BioScrip about its relationship with Novartis. *Id.* ¶ 92.

## III. The Alleged PBM Services Scheme

In addition to the alleged Exjade kickback scheme, Plaintiffs contend that the Defendants were engaged in a further act of deception. Specifically, BioScrip was concealing the fact that one of its significant business segments was rapidly losing value. Throughout 2013, BioScrip's pharmacy benefit management operating segment ("PBM Services") was allegedly hemorrhaging revenue. *Id.* ¶ 102.

The core of the PBM Services segment was the promotion of discount cash-card programs for individuals who were either uninsured or underinsured and whose insurance did not cover their medications. *Id.* ¶ 103. Use of BioScrip's discount card enabled these individuals to purchase prescription medications at substantial discounts through BioScrip's network pharmacies. *Id.*

PBM Services constituted a significant portion of revenue for BioScrip, constituting 20 percent of the company's total revenue in 2011 and 17 percent in 2012. *Id.* ¶ 106. Moreover, PBM Services was a high-margin business segment that provided steady cash flow necessary for BioScrip's aggressive growth strategy. *Id.* ¶ 107. The Plaintiffs allege that BioScrip consistently represented PBM Services as a reliable source of cash or an attractive segment for divestment. *Id.* ¶¶ 108–109. The Plaintiffs further contend that, because BioScrip had created the public perception that PBM Services was a big cash generator for the company, BioScrip was forced to conceal problems that were diminishing the value of the segment. On March 11, 2013, BioScrip reported that PBM Services had generated $111.9 million in revenue in 2012 and experienced positive growth. *Id.* ¶ 111. However, in the ensuing weeks, PBM Services lost a significant client in tandem with diminishing sales volume of its discount cards. *Id.* ¶ 112. Plaintiffs contend that BioScrip was aware of these challenges as early as the first quarter of 2013, *id.* ¶¶ 113–115, but did not disclose them to investors, instead representing that PBM Services' revenue would be "relatively flat" through 2013. *Id.* ¶¶ 118–119.

BioScrip's second quarter results for 2013 severely missed their revenue tar-

gets. *Id.* ¶ 120. The company revealed this on August 7, 2013, explaining the large decline in revenue was due to the loss of one low-margin client and a decline in discount card volume. *Id.* ¶ 121. Defendant Smith informed investors that nearly all of the decline in revenue, or about 88 percent, was due to the loss of this client. *Id.* ¶ 122. Similarly, both Defendants Smith and Tran represented the longer term stability of PBM Services in light of market demand for discount cards from underinsured individuals. *Id.* ¶ 123. Plaintiffs contend that these representations calmed skittish investors. *Id.* ¶ 126.

In September 2013, Defendant Tran again made remarks about the difficulties facing BioScrip's PBM Services segment, but insisted that volumes would be steady for the third quarter of 2013. *Id.* ¶¶ 128–129. In November 2013, BioScrip revealed that it had suffered further, albeit substantially more modest, decreases in quarterly revenue for PBM Services. *Id.* ¶ 131.

## IV. The Public Offerings

Plaintiffs further allege that, while BioScrip was allegedly propagating these two deceptive schemes, the company capitalized on its inflated stock price through two public offerings of BioScrip common stock. *Id.* ¶ 134. Specifically, in April 2013, six months after being served with the CID and a month or so after losing a major PBM Services Client, BioScrip conducted an offering of 10.4 million shares of common stock at a price of $12.00 per share. *Id.* ¶ 135. During this offering, Kohlberg sold approximately 4 million shares of common stock at the same price and realized net proceeds of over $45 million. *Id.* BioScrip received proceeds of just under $120 million and much of this cash was later used in the company's acquisition of CarePoint Partners Holdings LLC for

$223 million several months after the April 2013 offering. *Id.* ¶ 281.

In anticipation of the offering, BioScrip issued a prospectus on April 4, 2013 and a final prospectus supplement on April 19, 2013, both of which became part of the Shelf Registration Statement. *Id.* ¶ 277. Defendants Jeffries, Morgan Stanley, and SunTrust acted as Joint Book–Running Managers for this offering and Defendants Dougherty and Noble acted as Co–Managers. *Id.* ¶ 279.

On August 13, 2013, before disclosing the government's CID and before several public announcements about its PBM Services, BioScrip executed another public offering. *Id.* ¶ 137. During this offering, none of the shares at issue were sold by BioScrip itself, instead being offered by Kohlberg, which sold 6.9 million shares of BioScrip common stock at $13.65 per share, generating around $90 million. *Id.* These shares represented approximately 60 percent of Kohlberg's outstanding holdings in BioScrip. *Id.* ¶ 141.

BioScrip produced a prospects on August 13, 2013 which later became part of the Shelf Registration Statement. *Id.* ¶ 283. Morgan Stanley acted as the sole underwriter for this offering. *Id.* ¶ 285.

Around the time of the August offering, Defendant Bogusz, who was actively involved in the PBM Services segment, sold 39,687 shares of BioScrip common stock, netting a little over $290,000. *Id.* ¶ 143.

## V. The Decline in BioScrip Common Stock

The decline in value of BioScrip stock began in early August 2013 after the company announced the second quarter decline in PBM Services revenue. *Id.* ¶¶ 169–171. On August 8, 2013, the day after the announcement, BioScrip stock dropped from $16.63 per share to $13.54

per share, an 18 percent decline. *Id.* ¶ 171. At this time, the company reiterated· its belief ·that PBM Services was a stable business segment in the longer term. *Id.* ¶ 172. Several market observers responded positively to this representation and affirmed that PBM Services would experience steady flat growth. *Id.* ¶¶ 174–176.

On September 23, 2013, immediately after disclosure of the CID and the Government's intent to investigate BioScrip, the company's stock fell $0.62, or approximately six percent. *Id.* ¶ 180. The next day, on September 24, the price fell an additional $1.94 per share, or approximately 18 percent. *Id.* ¶ 188. The company's disclosure at this time stated that it was seeking to be proactive in apprising the public about the investigation. *Id.* ¶ 181. The Plaintiffs allege this was misleading, as the CID had been served on BioScrip many months earlier. *Id.*

Several weeks later, on November 6, 2013, BioScrip disclosed that it had set aside a $15 million litigation reserve in light of the government investigation into the alleged Exjade scheme. *Id.* ¶ 189. The company further disclosed a continued loss of revenue in PBM Services during the third quarter. *Id.* ¶ 191. After these disclosures, the company's common stock fell a further $1.54 per share, or approximately 20 percent. *Id.* ¶ 192.

On January 8, 2014, BioScrip revealed that it had entered into a settlement with the government, agreeing to pay $15 million. *Id.* ¶ 193. The settlement agreement reflected that BioScrip's ultimate liability may have been considerably greater than $15 million, but that due to increasingly constrained financial circumstances, $15 million was the maximum the company could pay while maintaining liquidity. *Id.*

Plaintiffs initially brought suit against BioScrip and the Individual Exchange Act

Defendants on September 30, 2013, a week after the company's disclosure of the CID. *See* Dkt. No. 1. They filed their Consolidated Class Action Complaint on February 19, 2014, adding Kohlberg as a defendant. *See* Dkt. No. 22. On April 28, 2014, the Defendants filed two motions to dismiss the Consolidated Class Action Complaint in its entirety. *See* Dkt. Nos. 41, 45.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, a plaintiff's complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," that "give[s] the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). For purposes of the motion to dismiss, all of the "factual allegations contained in the complaint" must be "accepted as true." *Id.* at 572, 127 S.Ct. 1955. Though these allegations need not be "detailed," they must "state a claim to relief that is plausible on its face." *Id.* at 555, 127 S.Ct. 1955. A complaint is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

On a Rule 12(b)(6) motion, a district court may consider "the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the docu-

ment 'integral' to the complaint." *DiFolco v. MSNBC Cable, LLC,* 622 F.3d 104, 111 (2d Cir.2010) (quoting *Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006)).

In securities fraud cases, the Private Securities Litigation Reform Act ("PSLRA") requires a complaint to "specify each statement [or omission] alleged to have been misleading, the reason or reasons why the statement [or omission] is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Rule 9(b) of the Federal Rules of Civil Procedure, which applies to allegations of fraud, imposes a comparable requirement. *See* Fed.R.Civ.P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.")

## DISCUSSION

Plaintiffs bring five claims against the Defendants. First, they bring a claim under § 10(b) of the Exchange Act and Rule 10b–5 against BioScrip, Kohlberg, and the Individual Exchange Act Defendants. CCAC ¶¶ 234–46. They further bring a § 20(a) control person claim against Kohlberg and the Individual Exchange Act Defendants. *Id.* ¶¶ 247–55. Plaintiffs' three remaining claims arise from the Securities Act: a claim under § 11 against BioScrip, the Individual Securities Act Defendants, and the Underwriter Defendants, *id.* ¶¶ 319–327; a § 12(a)(2) claim against BioScrip and the Underwriter Defendants, *id.* ¶¶ 328–334; and a § 15 control person liability claim against Kohlberg and the Individual Securities Act Defendants. *Id.* ¶¶ 335–339.

### I. Violation of § 10(b) of the Exchange Act and Rule 10b–5(b)

The Plaintiffs allege that Defendants BioScrip, Smith, Tran, and Bogusz violated § 10(b) of the Exchange Act and Rule 10b–5(b). *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. In order to establish a claim for securities fraud under Rule 10b–5, a Plaintiff must allege that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused plaintiff injury." *Fragin v. Mezei,* 09–cv–10287 (AJN), 2012 WL 3613813, at *7 (S.D.N.Y. Aug. 22, 2012) (quoting *Rothman v. Gregor,* 220 F.3d 81, 89 (2d Cir. 2000)). The Plaintiffs allege that BioScrip knowingly made false representations or misleading omissions about two discrete areas of its business—first, the Government's scrutiny of its participation in EPASS and sale of Exjade and, second, the declining fortunes of BioScrip's PBM Services segment. The Court turns first to the allegations relating to BioScrip's so-called kickback scheme.

### A. The Civil Investigative Demand and BioScrip's Legal Compliance

#### 1. Alleged Material Misstatements or Omissions

In October 2012, BioScrip was served with a CID relating to an ongoing government investigation into Novartis and its relationship with several specialty pharmacy companies. CCAC ¶ 87. Plaintiffs allege that the Defendants made several material misstatements or omissions about the CID and their legal compliance generally. First, BioScrip's November 9, 2012 Form 10–Q stated that:

> Management strives to maintain the Company in substantial compliance with all existing laws and regulations material to the operation of its business ...

From time to time, the Company responds to subpoenas and requests for information from Governmental agencies. The Company cannot predict with certainty what the outcome of any of the foregoing might be. There can be no assurance that the Company will not be subject to scrutiny or challenge under one or more existing laws or that any such challenge would not be successful.

CCAC ¶ 147.

Second, in its March 15, 2013 Form 10-K, BioScrip stated that:

Governmental entities have ... commenced investigations against specialty pharmaceutical distribution companies having dealings with pharmaceutical manufacturers concerning retail distribution and sales and marketing practices of certain products and therapies. There can be no assurance that we will not receive subpoenas or be requested to produce documents in pending investigations or litigation from time to time. In addition, we may be the target or subject of one or more such investigations or named parties in corresponding actions.

CCAC ¶ 152.

Third, in the same Form 10-K, the company stated:

From time to time, the Company responds to subpoenas and requests for information from Governmental agencies. The Company cannot predict with certainty what the outcome of any of the foregoing might be. While the Company believes it is in substantial compliance with all laws, rules and regulations that affects its business and operations, there can be no assurance that the Company will not be subject to scrutiny or

challenge under one or more existing laws or that any such challenge would not be successful.

CCAC ¶ 154.

Finally, also in the Form 10-K, BioScrip stated:

We periodically respond to subpoenas and requests for information from Governmental agencies. We confirm that we are not a target or a potential subject of a criminal investigation. We cannot predict with certainty what the outcome of any of the foregoing might be or whether we may in the future become a target or potential target of an investigation or the subject of further inquiries or ultimately settlements with respect to the subject matter of these subpoenas.

*Id.*[2]

Three issues are raised by Plaintiffs' allegations about the alleged kickback scheme. First, whether any of the statements made by BioScrip were false or misleading in light of the fact that it had been served with the CID. Second, whether the issuance of the CID triggered an independent obligation on BioScrip's part to reveal the Government's request. Third, whether BioScrip's statements that it believed itself to be in "substantial compliance with all laws, rules and regulations," CCAC ¶ 154, were false or disbelieved at the time they were made and whether they omitted material facts relevant to the basis of those statements, but conflicting with facts a reasonable investor would assume from the statement. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* ⸺ U.S. ⸺, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015).

---

2. The Plaintiffs also point to another statement, in BioScrip's 2013 first quarter Form 10-Q, that is effectively identical to the third statement above, concerning BioScrip's periodic response to subpoenas and requests for information.

As to the first issue, the Court concludes that the Plaintiffs have adequately alleged a misstatement by BioScrip for those statements suggesting it routinely responded to investigatory requests from the Government, but was not presently in the process of responding to such a request. For instance, in its March 15, 2013 Form 10–K, the company represented that there could be "no assurance that we will not receive subpoenas or be requested to produce documents in pending investigations or litigation from time to time." CCAC ¶ 152. Similarly, in both the March Form 10–K and the November 9, 2012 Form 10–Q, BioScrip stated that "[f]rom time to time, the Company responds to subpoenas and requests for information from Governmental agencies." *Id.* ¶¶ 147, 154. Even assuming these statements were not literally false, the "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC,* 595 F.3d 86, 92 (2d Cir.2010). Construing the allegations in Plaintiffs' favor, it is plausibly alleged that these statements were misleading because the inference is available that a reasonable investor could have read them to mean that BioScrip was not already in receipt of just such a request for information. While the language "no assurance that we will not receive" could be read as a warning to investors that BioScrip may receive such a demand in the future, the inference is available at this stage in the proceedings that it could also be reasonably read as assuring the investor that no such threat existed at that precise moment. Having chosen to speak about the potential investigations and document requests, BioScrip had an obligation to ensure its statements were "both accurate and complete," even if it lacked an independent duty to discuss the information in the first place. *See Meyer v. Jinkosolar Holdings Co.,* 761 F.3d 245, 250 (2d Cir. 2014) (citing *Caiola v. Citibank, N.A., N.Y.,* 295 F.3d 312, 331 (2d Cir.2002)) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.") The amended complaint therefore adequately alleges that BioScrip, having chosen to speak on the subject of investigations, did not speak in an "accurate and complete" manner. *See Caiola,* 295 F.3d at 331.

Plaintiffs further contend that BioScrip had an independent obligation to disclose the existence of the CID but instead "omitted to disclose the government's investigative demand into BioScrip's Exjade Kickback Scheme ..." *See* CCAC ¶ 147. In general, "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *Stratte–McClure v. Morgan Stanley,* 776 F.3d 94, 101 (2d Cir.2015) (citing *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir.1993)). Disclosure is not required simply because an investor might find the information relevant or of interest. *See Kleinman v. Elan Corp., plc,* 706 F.3d 145, 152–153 (2d Cir.2013) (citing *Resnik v. Swartz,* 303 F.3d 147, 154 (2d Cir.2002)).

A duty to disclose under Rule 10b–5 may arise either "(1) expressly pursuant to an independent statute or regulation; or (2) as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts." *In re Lululemon Sec. Litig.,* 14 F.Supp.3d 553 (S.D.N.Y.2014). Plaintiffs do not point to any statute or regulation establishing an independent duty on BioScrip's part to disclose the CID under Rule 10b–5, but they do contend that BioScrip had a duty

to disclose the CID in order to ensure that other statements they made were not misleading. For example, Plaintiffs point to the statement that there was "no assurance that [BioScrip] will not receive subpoenas or be requested to produce documents in pending investigations," when in fact BioScrip had received just such a request. *See* CCAC ¶ 152. The Court agrees and, as already explained, Plaintiffs have adequately alleged that BioScrip's existing statements were rendered misleading by their failure to disclose the CID.

 Finally, Plaintiffs contend that BioScrip's statements of legal compliance were materially misleading. *See* CCAC ¶¶ 154, 156. This includes statements such as "[w]hile the Company believes it is in substantial compliance with all laws, rules and regulations that affects its business and operations, there can be no assurance that the Company will not be subject to scrutiny or challenge under one or more existing laws or that any such challenge would not be successful," *see* CCAC ¶ 154; "[o]ur management carefully considers the importance of such anti-kickback laws when structuring each company's operations and believes that each of our respective companies is in compliance therewith;" "[w]e believe we are in compliance with the legal requirements imposed by the anti-kickback laws and regulations;" "[w]e believe we have procedures in place to ensure the accuracy of our claims" and "we believe we are in compliance with Medicaid and Medicare billing rules and requirements." *Id.* ¶ 156.

These were statements of opinion or belief concerning the vitality of BioScrip's legal compliance measures. The Second Circuit directs that a statement of opinion is actionable as securities fraud "to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir.2011). *See also Kowal v. IBM (In re IBM Corporate Sec. Litig.)*, 163 F.3d 102, 109 (2d Cir.1998) ("[A]n opinion may still be actionable if the speaker does not genuinely and reasonably believe it or if it is without a basis in fact.").

But the Supreme Court has very recently opined on this standard and provided a roadmap for evaluation of the issues here. *See Omnicare*, 135 S.Ct. at 1320–21.[3] In *Omnicare*, the Supreme Court first reconfirmed that a "statement of opinion does not constitute an 'untrue statement of ... fact' simply because the stated opinion ultimately proves incorrect." *Id.* at 1326–27. But the Court also concluded that "opinion statements are not wholly immune from liability" and may be considered material misstatements or omissions under several circumstances. For instance, the opinion concluded that all opinion statements "explicitly affirm[ ] [at least] one fact: that the speaker actually holds the stated belief." *Id.* Thus, as *Fait* makes clear, allegations that an opinion is both objectively false and disbelieved by the defendant at the time they were made can state a material misstatement claim. *See Fait*, 655 F.3d at 110.

Moreover, *Omnicare* further held in the omission context that, "depending on the circumstances, [a reasonable investor may] understand an opinion statement to convey facts about how the speaker has formed the opinion." *Id.* at 1328. Thus, if a parties' statement of opinion "omits material facts about the [party's] inquiry into or

---

**3.** The Supreme Court announced its opinion in *Omnicare* on March 24, 2015, which was after the present motions were fully briefed. Subsequently, the parties provided letter briefing on the consequence of that opinion on this case, which the Court has considered in reaching the conclusions stated in this Memorandum & Order. *See* Dkt. Nos. 63–66.

knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself," liability may accrue. *Id.* Accordingly, the Court understands *Omnicare* to stand for the proposition that a legal compliance statement may be deemed misleading if, although sincerely held, it is formed on the basis of an omitted fact, not disclosed by the speaker, that would likely conflict with a reasonable investor's own understanding of the facts conveyed by that statement. *See Omnicare*, 135 S.Ct. at 1331–32 ("Section 11's omissions clause, as applied to statements of both opinion and fact, necessarily brings the reasonable person into the analysis, and asks what she would naturally understand a statement to convey beyond its literal meaning. And for expressions of opinion, that means considering the foundation she would expect an issuer to have before making the statement.")

To the extent *Fait* has been construed to mean that there is liability for legal compliance opinions only in the context of statements subjectively disbelieved when made, but not in instances where a speaker's statement, although sincerely believed, failed to make clear the factual basis for that statement, *Omnicare* may call that interpretation into question. *See Freidus v. ING Groep N.V.*, ⸺ U.S. ⸺, 135 S.Ct. 1698, 191 L.Ed.2d 671 (2015) (remanding case affirmed on the basis of *Fait* in light of *Omnicare* ). But the Court need not linger on this question because it concludes that Plaintiffs' allegations are, at the motion to dismiss stage, able to meet both standards.

According to Plaintiffs' allegations, receipt of the CID put the Defendants on notice about a number of key facts. First, it informed BioScrip that the Government was actively investigating Novartis' sales practices as to specialty pharmacy compa-

nies, such as BioScrip. *See* CCAC ¶ 87. Second, per 31 U.S.C. § 3733, it indicated that the Government believed BioScrip possessed information relevant to its false claims investigation. *Id.* Third, pursuant to the same statute, it informed BioScrip of "the nature of the conduct constituting the alleged violation of a false claims law which is under investigation, and the applicable provision of law alleged to be violated." *Id.*

Under the *Fait* standard alone, Plaintiffs have adequately alleged that the legal compliance statements were both objectively false and disbelieved at the time they were made. *See Fait*, 655 F.3d at 110. First, Plaintiffs allege that the CID itself stands as an indication that BioScrip and the other Defendants did not actually believe the legal compliance statements when made, because the CID explicitly informed the Defendants as to what conduct was being investigated by the Government. *See* CCAC ¶¶ 87–89. Construing Plaintiffs' allegations as true, that conduct would have looked remarkably similar to the conduct BioScrip had been engaged in for a number of years and at the very least allows for the inference that the Defendants did not actually believe the compliance statements. *Id.* Additionally, the Government's investigation led to testimony from former Exjade Team members directly involved in sales of the drug that, Plaintiffs allege, further reinforce the allegation that Defendants were aware of the regulatory implications posed by the CID. *Id.* ¶¶ 90, 197. In light of their knowledge of the CID and the common belief amongst those most directly involved in the conduct at issue that BioScrip was skirting regulatory requirements, Plaintiffs' allegations allow for the inference that BioScrip could not have believed the veracity of its legal compliance statements. *See* CCAC ¶¶ 67. This is particularly true in light of the

company's *affirmative* misstatements concerning the pendency of an investigation, which a reasonable investor would have considered in tandem with the legal compliance statements. *See Omnicare*, 135 S.Ct. at 1332 (concluding that whether an omissions makes an opinion misleading must be considered from the perspective of a reasonable investor "reading the statement fairly and in context"). *See In re Morgan Stanley*, 592 F.3d 347, 360 (2d Cir.2010) (noting that a defendants' statements must be considered in context when determining whether they would have misled a reasonable investor). Considering these misstatements in the context of the legal compliance statements, Plaintiffs' amended complaint plausibly alleges that the Defendants did not truly believe their otherwise broad affirmations of compliance. *Id.*

Under *Omnicare*, the Court must consider whether certain material facts, implied by BioScrip when they opined as to their legal compliance, were omitted and if those facts would then conflict with what a reasonable investor would have taken from the statement itself. *See Omnicare*, 135 S.Ct. at 1328–29. Justice Kagan provides a straightforward example in her opinion: if a speaker states that they believe their conduct is lawful, but has failed to consult a lawyer before making this statement, it could be misleadingly incomplete. *Id.* The question then is whether BioScrip's statements that it believed it was "in substantial compliance" with relevant laws and regulations would have led a reasonable investor to assume the company was not in receipt of a document akin to the CID and all of the information Plaintiffs allege that conveyed, despite the fact that it was.

The Court concludes that Plaintiffs have plausibly alleged that BioScrip's statements could have led a reasonable investor to conclude that BioScrip was not present-

ly involved in a wide-ranging investigation into its sales practices. There is an available inference that a reasonable investor digesting BioScrip's statements, would have taken the legal compliance statements to mean that BioScrip had taken an appropriate internal review of their own compliance procedures and possible legal liabilities, including the potential consequence of the CID. The allegations are not that the CID guaranteed that BioScrip would eventually become a direct target of the investigation or accrue any liability, but rather that it posed a major compliance challenge to BioScrip, particularly in light of the fact that it explicitly laid out the conduct under investigation. *See* CCAC ¶ 87. Construing the allegations most favorably to the Plaintiffs, there is an available inference that a reasonable investor could have taken BioScrip's assurances of compliance as a guarantee that it was not presently involved in any serious investigation concerning conduct directly related to a business segment for which the company retained liability.

This argument is reinforced by the affirmative misstatements the Court has already identified, such as that there was "no assurance that [BioScrip would] not receive subpoenas or be requested to produce documents in pending investigations or litigation from time to time." *See* CCAC ¶ 89. *See also Omnicare*, 135 S.Ct. at 1331–32; *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 360. It is further reinforced because, according to the allegations, the CID did more than simply serve BioScrip with a document demand, it also informed BioScrip of the conduct at issue in the investigation. *See* CCAC ¶ 87. Even if BioScrip had in fact scrupulously reviewed its compliance in the wake of the CID and concluded that it did not pose a significant liability to the company, Plaintiff's allegations adequately allege that a reasonable investor would

likely find a conflict between such a *carte blanche* conclusion in light of the existence of the CID and the significant challenge it posed to BioScrip. Under the *Omnicare* standard, this is sufficient at this stage of the proceedings.

Indeed, *Omnicare* seems to anticipate this very sort of factual scenario. Justice Kagan wrote that liability may accrue if a speaker expresses an opinion yet proceeds "with knowledge that the Federal Government was taking the opposite view." *Omnicare*, 135 S.Ct. at 1329. In such a situation, the reasonable investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the [speaker's] possession at the time." *Id.* Regardless of whether BioScrip reasonably believed the CID was a minor issue or not, Plaintiffs adequately allege that a reasonable investor would feel entitled to an explanation as to how the broad legal compliance statement "align[ed] with the information" in BioScrip's "possession at the time." *Id.*

BioScrip has two primary counter-arguments. First, they raise the significant consideration that the Stipulation of Settlement signed by BioScrip and the Government stated that it was only on "September 11, 2013 [that] the United states first notified BioScrip that the United States was contemplating civil claims against BioScrip under the FCA relating to BioScrip's distribution of Exjade (but did not at that time reveal the existence of the Action under seal or the fact that BioScrip was named as a defendant therein by the Relator)." Opp., Ex. B, Ex. 10.1 (emphasis added). This was *after* the last of BioScrip's statements identified by Plaintiffs as being misleading and thus may cast doubt on whether the statements or omissions were truly misleading in light of the fact that BioScrip had not yet been told that

the United States was contemplating civil charges. The meaning and import of this statement may very well seriously undermine Plaintiffs' plausible allegations about the information conveyed by the CID. But it does not directly contradict those allegations and thus is not a basis for Rule 12(b)(6) dismissal. *See, e.g., Accurate Grading Quality Assur., Inc. v. Thorpe*, 12–cv–1343 (ALC), 2013 WL 1234836, at *8 (S.D.N.Y. Mar. 26, 2013) (courts may disregard allegations only when they are "directly contradicted" by evidence incorporated into the complaint by reference); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F.Supp.2d 371, 405 (S.D.N.Y.2001) (court need not accept allegations that are directly contradicted "by statements in the complaint itself or by documents upon which its pleadings rely").

BioScrip's second major counter-argument is that none of the statements identified in the Plaintiffs' amended complaint were made contemporaneously with the conduct identified in the Government's complaint. Indeed, BioScrip sold its specialty pharmacy division in May 2012. *See* CCAC ¶ 38. As an initial matter, it is noteworthy that the Form 10–K containing many of the misstatements at issue here did in fact cover the five months in 2012 during which BioScrip continued to operate its specialty pharmacy division. *See* CCAC ¶ 89. Additionally, Defendants' timing argument is undermined by *Omnicare*. Again, the Court in *Omnicare* made clear that statements of opinion are actionable if the basis for forming that opinion is not disclosed and is similarly in conflict with facts a reasonable investor would draw from the opinion. *See Omnicare*, 135 S.Ct. at 1328–29. According to the amended complaint, after BioScrip spun off the specialty pharmacy division in May 2012, it nonetheless retained liability for that segment and remained "subject to claims by, and liabilities to, various stake-

holders or other parties, including . . . regulatory authorities . . ., resulting from the conduct" of the specialty pharmacy division. *See* CCAC ¶ 38. In light of this allegation, the contention is plausibly made that a reasonable investor considering the legal compliance statement could have understood it to refer to BioScrip's legal compliance for anything relating to its legal liabilities, rather than only to its existing business segments.

In sum, these pleadings plausibly allege that BioScrip's legal compliance opinions were misstatements under both *Fait* and *Omnicare*. Given allegations of the company's complete silence as to the CID until after the Government had elected to pursue civil charges, the argument is plausibly made that a reasonable investor could have been misled by the one-two punch of the assertion that (1) BioScrip could be investigated in the future, but (2) that it was presently in full legal compliance.

Additionally, it is premature to dismiss these statements, as Defendants urge, as immaterial. While the materiality of the misstatements is, naturally, not altogether clear at this stage of the proceedings, the Court cannot conclude that knowledge of the CID was "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir.2011) (quoting *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985)) (concluding that dismissal is not appropriate on the ground that the alleged misstatements are not material unless obviously unimportant to a reasonable investor). Plaintiffs adequately allege that the existence of the CID "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Tabak v. Canadian Solar Inc.,* 549 Fed.Appx. 24, 27 (2d Cir.2013) (quoting *Hutchison v. Deutsche Bank Secs. Inc.,* 647 F.3d 479, 485 (2d Cir.2011)). Accordingly, the amended complaint sufficiently pleads actionable material misstatements and omissions under Rule 10b–5 and § 10(b).

## 2. Scienter

Having concluded that Plaintiffs plausibly allege that the Defendants made material misstatements and omissions about the pendency of the Government's investigation and the existence of the CID, the Court next must determine whether the Plaintiffs have adequately alleged the requisite scienter. To adequately plead scienter under § 10(b) and Rule 10b–5, a plaintiff must "plead the factual basis which gives rise to a strong inference of fraudulent intent." *IKB Int'l S.A. v. Bank of Am. Corp.,* 584 Fed.Appx. 26, 27 (2d Cir.2014) (citing *O'Brien v. Nat'l Prop. Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991)). A strong inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (citing *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290–91 (2d Cir.2006)). A plaintiff adequately alleges scienter "only if a reasonable person would deem the inference of scienter *cogent and at least as compelling as any opposing inference one could draw from the facts alleged.*" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (emphasis added).

To some extent, the question of scienter largely turns on the same considerations as those concerning the Defendants' statements of opinion. "[W]here plaintiffs allege a false statement of opinion, 'the falsity and scienter requirements are essentially identical' because 'a materi-

al misstatement of *opinion* is by its nature a false statement, not about the objective world, but about the defendant's own belief.'" *In re Sanofi Sec. Litig.*, 87 F.Supp.3d 510, 534, 13–cv–8806 (PAE), 2015 WL 365702, at *18 (S.D.N.Y. Jan. 28, 2015) (quoting *Podany v. Robertson Stephens, Inc.*, 318 F.Supp.2d 146, 153 (S.D.N.Y.2004)). *See also In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 757 F.Supp.2d 260, 311 (S.D.N.Y.2010). Even if the direct equivalence between scienter and the pleading standard for opinion statements does not hold in all circumstances, the Court concludes the Plaintiffs have adequately alleged scienter as to the legal compliance statements. According to the amended complaint, BioScrip had the CID in hand when it made the legal compliance statements, yet elected not to disclose the CID's existence in order to make fully clear the basis for its opinions. *See* CCAC ¶¶ 88, 89. This satisfies scienter under both *Fait* and *Omnicare*. First, it means that Plaintiffs have plausibly alleged that BioScrip subjectively knew about the CID, which identified conduct potentially implicating BioScrip in the Government's investigation, yet nonetheless stated publicly that they were in legal compliance. Second, it provides an adequate allegation that BioScrip was reckless in electing to withhold knowledge of the CID, despite its significant role in formulating a basis of belief that BioScrip was in legal compliance. *See In re ITT Educ. Servs., Sec. Litig.*, 34 F.Supp.3d 298 (S.D.N.Y.2014) (scienter adequately alleged where defendant knowingly withheld facts relevant to opinion statements about potential liability). Plaintiffs have therefore plausibly alleged scienter regarding omission of the CID in relation to the legal compliance statements.

The Court similarly concludes that the Plaintiffs have also alleged scienter as to the affirmative misstatements concerning the existence of the CID. Plaintiffs allege that the company's possession of the CID put it on notice that, even if litigation was not impending, it was, in fact, *actively* responding to a subpoena and request for information from the Government, despite treating such a scenario as a mere hypothetical in its disclosures. *See* CCAC ¶ 154. ·The Plaintiffs have adequately alleged that the Defendants "knew facts or had access to information suggesting that their public statements were not accurate," thus Plaintiffs supply the strong inference of scienter needed to surpass a motion to dismiss. *See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir.2009) (citing *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir.2000)).

### 3. Loss Causation

 Although Plaintiffs have adequately alleged both a number of material misstatements and the Defendants' scienter as to those statements, they still must plead loss causation, which requires them to allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir.2001). They may do so either by alleging (a) "the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;" or (b) that "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232–33 (2d Cir. 2014) (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir.2010)) (internal quotations removed).

Defendants raise two arguments on this point, including that the information about

the Exjade investigation had grown stale and that Plaintiffs failed to disaggregate the alleged stock losses tied to the Defendants' alleged dishonesty, rather than the Government's initiation of possible civil charges against BioScrip. *See* Def.'s Br. at 21–23. The Court is not persuaded. As to the first, it is premature to determine as a factual matter whether or not the information had become stale. *See Carpenters Pension Trust Fund*, 750 F.3d at 235. The Plaintiffs have raised a number of allegations sufficient to demonstrate that the information was not in fact stale, notably that BioScrip's eventual disclosure of the investigation was the first the market had learned about BioScrip's potential liability and further that the disclosure came at a time when the market was expressing concerns about the company's liquidity. *See* CCAC ¶¶ 190, 193.

■ The second argument is also unconvincing. Although it is not clear what portion of the loss can be pegged to BioScrip's prior misstatements as compared to the Government's potential lawsuit, at the pleading stage a Plaintiff "need not demonstrate that defendants' misstatements or omissions caused *all* of plaintiffs' losses. Rather, plaintiffs need only allege facts that would allow a factfinder to ascribe *some rough proportion* of the whole loss to [the defendant's alleged] misstatements." *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F.Supp.2d 334, 339 (S.D.N.Y.2010) (emphasis and brackets in original). Plaintiffs' allegations ascribe some rough portion of the loss to the misstatements, particularly in light of the fact that, prior to the corrective disclosure, the market had been entirely unapprised of the fact that BioScrip was even involved in the Government's investigation into Novartis. *See* Barday Deck, Ex. O at F–60;

Ex. P at 39.[4] Plaintiffs have adequately plead that the loss was foreseeable to BioScrip at the time they made the misstatements and that the risk concealed materialized, and was exacerbated by, BioScrip's misstatements. *See* CCAC ¶¶ 95–97.

### B. PBM Services

Plaintiffs also allege the existence of another, discrete scheme, propagated by BioScrip and the Individual Exchange Act Defendants so as to mask the company's diminishing revenue in a key business segment. In a May 8, 2013 press release discussing 2013 first quarter financial results, BioScrip disclosed a $3.1 million, or 10.4 percent, quarterly decline in PBM Services as compared to the first quarter of 2012. CCAC ¶ 163. BioScrip attributed this decline to "a reduction in discount card volume." *Id.* The press release nonetheless reaffirmed BioScrip's 2013 revenue target for the segment. *Id.* During a conference call the following day, Defendant Tran stated that the PBM business would not experience further declines and would remain "relatively flat." *Id.* ¶ 164.

Plaintiffs allege these statements were false because BioScrip and the Individual Exchange Act Defendants were aware of the fact that on March 31, 2013 BioScrip had lost a major PBM Services client and that this would have a significant impact on the company's earnings in the second quarter. *Id.* ¶ 165.

On August 7, 2013, BioScrip released its second quarter 2013 earnings press release, disclosing a significant decline in PBM Services revenue. *Id.* ¶ 169. Specifically, second quarter profits had fallen $10.4 million as compared to the first quarter, constituting a 39 percent decline. *Id.*

---

**4.** In addition to Novartis' disclosure, one of BioScrip's competitors in EPASS had also disclosed its receipt of the CID. *See* CCAC ¶ 89 n. 3.

BioScrip attributed the drop to a decline in discount card volume and the loss of one large, but low-margin, client. *Id.* ¶¶ 169–171. Plaintiffs allege that BioScrip misleadingly downplayed the losses, however, by promoting the segments stability and the volume of new business that it was allegedly generating. On calls with investors, Defendant Smith stated that "overall discount card volume should benefit from the implementation by new distribution partners of prescription discount cards through their pre-existing network" and explained that BioScrip "continued to see utilization of discount cards, as well as interest from patients and new distribution partners." *Id.* ¶ 172. Defendant Tran stated that "the market for these cards [is] *not* going away." *Id.* ¶ 173. Plaintiffs contend that these statements, in conjunction with the company's assertions that PBM Services revenue would remain flat, misled investors by concealing the extent to which the segment was suffering.

During a September 24, 2013 investor presentation, BioScrip offered an increasingly sanguine description of its PBM Services segment. In addition to adjusting net income expectations downwards by 20 percent, Defendant Tran explained that "PBM continues to show signs of risk" and that BioScrip was taking "lumps and . . . body blows from the PBM business." *Id.* ¶ 185. Nonetheless, Tran also informed investors that PBM Service's "[v]olumes were steady for Q3." *Id.* ¶ 186. Next, on November 6, 2013, the company announced further decreases in PBM Services revenue and again explained the decline as resulting "primarily from the termination of a contract with a large, low-margin, funded PBM client, as well as a decrease in volume in the prescription card business." *Id.* ¶ 191.

### 1. Materially Misleading Statements or Omissions

▇ The majority of these statements are not actionable under Rule 10b–5 and § 10. Although Plaintiffs focus on the fact that PBM Service's revenue continued to decline into the third quarter of 2013, this decrease was a small fraction of the 39 percent decrease the segment saw between the first and second quarter of the same year. For instance, although BioScrip's PBM Services revenue declined from $26.8 million in the first quarter of 2013 to $16.3 million in the second quarter, *see* Barday Deck, Exs. C, G, it did, in fact, hold steady at approximately $16 million for the third quarter of the same year. *Id.*, Ex. H. While this represented a significant decrease in the segment's earnings on a year-to-year basis, *id.*, Defendant Tran's statement in August 2013 that PBM Services revenue was likely to be flat between the second quarter and third quarter of 2013 was literally true, as was his statement that volume was steady for the third quarter. Accordingly, even taking all of Plaintiffs allegations as true, Tran's statement on this issue is not plausibly alleged as a material misstatement or omission.

▇ Defendants' other statements after the August disclosures are also nonactionable. Plaintiffs fail to explain how BioScrip's statement that it "continued to see utilization of discount cards, as well as interest from patients and new distribution partners" was untrue. Similarly, Plaintiffs do not adequately allege that Tran and Smith's forward-looking statements in August 2013 were either disbelieved at the time, untrue, or relied upon an omitted fact that would have conflicted with those presumed by a reasonable investor hearing the statement.[5] They insist the state-

---

**5.** Defendant Smith predicted that "overall discount card volume should benefit from the

ments were misleading because BioScrip was experiencing decreased volumes in discount card sales, but in support of this they point only to a single confidential witness, a broker of the discount cards, who stopped doing business with BioScrip in "August or September 2013." CCAC ¶ 114. Not only are the allegations unclear as to whether this particular broker ceased selling BioScrip discount cards before or after Tran and Smith made their statements in early August 2013, but the experience of a single discrete broker is not the sort of information that a speaker implicitly represents as forming a basis for their opinion on the broader state of their business. *See Omnicare*, 135 S.Ct. at 1328–29. Accordingly, Plaintiffs have failed to allege that any statements made after or in conjunction with their second quarter Form 10–Q were either untrue or disbelieved when made.

■ Defendants' statements prior to that disclosure, however, are sufficiently pled as material misstatements. For instance, during the May 2013 investor call, Defendant Tran stated that PBM Services revenue going forward would be "relatively flat." *Id.* ¶ 164. But by this time, according to the Plaintiffs' allegations, Tran should have been aware of that fact that BioScrip lost a major PBM Services client at the end of March 2013 and that this was likely to have a severe impact on second quarter revenues for PBM Services. Indeed, second quarter revenues fell by 39 percent, *id.* ¶ 169, and Defendants themselves acknowledged that nearly 90 percent of this loss (or $9.1 million out of a $10.3 million decrease) was the result of losing that single client. *Id.* ¶ 122.

Defendants raise a number of arguments as to why this statement is not

misleading. First, they argue that forward-looking statements are not actionable when accompanied by meaningful cautionary statements. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773–77 (2d Cir.2010). They then point to a number of cautionary statements included in BioScrip's annual and quarterly disclosures. *See, e.g.*, Opp., Exs. D at 1; A at 21–25. Second, they contend that BioScrip had no obligation to reveal the loss of the client before filing their second quarter Form 10–Q in August 2013.

■ Neither argument is persuasive. First, Plaintiffs plausibly allege that, at the time Tran claimed PBM Services revenue would be "relatively flat," BioScrip in fact possessed information undercutting this claim. As courts in the Second Circuit have advised, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir.2004) (citing *In re Prudential Secs. Inc. P'ships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y.1996)). *See also In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F.Supp.2d 423, 495 (S.D.N.Y.2011) Accordingly, the inference is available that Defendants' cautionary statements were, if anything, misleading in light of the fact that they bespoke caution concerning an event already certain to occur, namely the severe downturn in revenue in the second quarter. As the Second Circuit has explained:

> The cautionary language associated with the "bespeaks caution" doctrine is aimed at warning investors that bad things may come to pass—in dealing with the contingent or unforeseen future. Historical or present fact—knowledge with-

---

implementation by new distribution partners of prescription discount cards through their pre-existing network," CCAC ¶ 172, while Defendant Tran stated that "the market for these cards [is] *not* going away." *Id.* ¶ 173.

in the grasp of the offeror—is a different matter. Such facts exist and are known; they are not unforeseen or contingent. It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language.

*See P. Stolz Family P'ship L.P. v. Daum,* 355 F.3d 92, 97 (2d Cir.2004). In sum, Defendants' cautionary statements here are not curative at the pleadings stage.

Defendants next argue that they were under no obligation to disclose the loss of the major client until their next routine quarterly disclosure in August. This may well have been true, but for Defendants decision to affirmatively state that they anticipated "relatively flat" revenues from PBM Services. After electing to make this statement, Plaintiffs plausibly allege that BioScrip was obliged to disclose the loss of a major client in order to make the statement not misleading. *See Lifemark Sec. Corp.,* 84 F.Supp.3d at 244–45, 2015 WL 114153, at *5. *See also In re Facebook, Inc. IPO Sec. & Derivative Litig.,* 986 F.Supp.2d 487, 518 (S.D.N.Y.2013) ("Moreover, Facebook's risk warnings are alleged to be more than mere opinions, they were misstatements of present fact, warning that something 'may' occur when that event 'had' already occurred, and not mere opinions of future possibilities.").

Moreover, Plaintiffs have adequately alleged the materiality of Tran's misstatement. Defendants insist the statement was immaterial because the lost revenue attributable to the major client's departure was a mere 4.7 percent of BioScrip's second quarter revenue. They note that in *Tabak* the Second Circuit favorably referenced the SEC's five percent "rule of thumb" for assessing materiality. *See* 549

Fed.Appx. at 27. But the Court in *Tabak* also observed that "there is no bright-line numerical test" for assessing materiality. *Id.* The Second Circuit has previously emphasized that courts cannot rely solely on the quantitative impact of a misstatement, but must consider quantitative factors in conjunction with qualitative factors. *See Litwin,* 634 F.3d at 719 (overturning district court's conclusion that misstatement was immaterial solely because it fell well below the five percent threshold). The Court's reasoning in *Litwin* is particularly persuasive. If district courts were to simply apply the five percent rule of thumb in a rote manner, it would "effectively sanction misstatements ... so long as the net effect on [ ] revenues ... was immaterial." *Id. See also City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.,* 875 F.Supp.2d 359, 368 (S.D.N.Y.2012) (observing that five percent threshold is "merely a rule of thumb" and that "materiality cannot be reduced to a numerical formula").

Instead of relying on a one-size fits all rule, the Court must engage in "a fact-specific inquiry." *ECA, Local 134 IBEW,* 553 F.3d at 197 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 240, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). PBM Services comprised approximately 20 percent of BioScrip's net revenue and represented just under 40 percent of its EBITA,[6] a key metric often touted by BioScrip in its public statements. CCAC ¶¶ 102, 106. Perhaps more importantly, BioScrip frequently promoted PBM Services as a high-margin segment and a strong generator of cash flow, enabling BioScrip to generate large sums to reinvest in other areas of business. *Id.* ¶ 107. Even if the misstatements only concerned losses of revenue representing just under five percent of BioScrip's quarterly revenue, the

---

**6.** EBITA standards for earnings before interest, taxes, depreciation, and amortization.

misstatements also arguably concerned a particularly noteworthy segment of BioScrip's overall business. *See Litwin,* 634 F.3d at 720 ("Even where a misstatement or omission may be quantitatively small compared to a registrant's firm-wide financial results, its significance to a particularly important segment of a registrant's business tends to show its materiality."). *See also New Orleans Employees Ret. Sys. v. Celestica, Inc.,* 455 Fed.Appx. 10, 16 (2d Cir.2011) (refusing to dismiss complaint based on losses that "were minuscule in comparison to [defendant's] global assets and annual revenue" due to other qualitative factors). Accordingly, at this stage, the Court cannot conclude that the alleged losses attributable to the major client's departure were immaterial. *See City of Pontiac,* 875 F.Supp.2d at 368.

## 2. Scienter

 Having determined that the complaint adequately alleges materially false misstatements as to those pre-August 2013 statements the Defendants made about the PBM Services segment, the next step is to consider whether scienter has been adequately plead with respect to those misstatements. The Court concludes that scienter has not been adequately plead on this claim.[7]

The CCAC relies on a smattering of circumstantial theories in the hope that one provides an inference of scienter. In the first instance, Plaintiffs rely on aspects of the business segment itself—that it was touted by BioScrip as a high-margin cash generator and that it composed a significant portion of the company's revenue and even a larger share of EBITA. Second, they observe that the major client BioScrip lost in March 2013 provided nearly a third of the segments revenue. Finally, they contend that the Defendants had access to information that should have made clear the inaccuracy of their public statements.

Plaintiffs' allegations boil down to the charge that Defendants *must have known* their statements to have been untrue due to the segment's significance and the size of the client. *See Sinay v. CNOOC Ltd.,* 554 Fed.Appx. 40, 42 (2d Cir.2014) (plaintiff failed to adequately allege scienter based on what defendant "must have known"). While it is true that PBM Services constituted a significant area of business for BioScrip, that alone does not allow for an inference of scienter. *Cf. Tyler v. Liz Claiborne, Inc.,* 814 F.Supp.2d 323, 334 (S.D.N.Y.2011) (collecting cases and summarizing move away from "Core Operations" doctrine due to PSLRA's requirement that scienter be "stated with particularity"). Accordingly, merely noting that an area of business was vital to a company "does not dispose of the general requirement that Plaintiffs allege facts available to Defendants that would have illuminated the falsities." *Louisiana Mun. Police Employees' Ret. Sys. v. Green Mountain Coffee Roasters, Inc.,* 11–cv–289, 2013 WL 6728869, at *16 (D.Vt. Dec. 20, 2013). Pointing to BioScrip's promotion of PBM Services and the revenue it generated provides the dressing, but not the meat, of adequate scienter allegations.

Plaintiffs are thus left to rely primarily on the argument that the Defendants had information available to them that belied their public statements. While it is true that BioScrip had lost its major PBM Services client several months before Defendant Tran made his statement to investors in May 2013, Plaintiffs have nonetheless failed to allege "what specific contradictory information the Individual Exchange

---

7. The Court applies the same legal standard for scienter as it did in the previous section concerning Plaintiffs' CID and legal compliance allegations. *See supra* Section I.A.2.

Act Defendants received or when they received it." *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.,* 724 F.Supp.2d 447, 461 (S.D.N.Y.2010) *aff'd Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.,* 430 Fed.Appx. 63 (2d Cir.2011). The facts adduced by the Plaintiffs stand in stark contrast to their own cited precedent. For instance, in *Freudenberg v. E\*Trade Fin. Corp.,* 712 F.Supp.2d 171, 198 (S.D.N.Y.2010), the complaint referred to sixteen confidential witnesses who "provide[d] accounts of what they told Defendants, what Defendants knew, and/or what was discussed internally that is alleged to be contrary to Class Period statements." Similarly, in *In re Check Point Software Technologies Ltd. Sec. Litig.,* 03–cv–6594 (RMB), 2006 WL 1116699, at \*3 (S.D.N.Y. Apr. 26, 2006), the witnesses cited in the complaint detailed specific statements and actions made by the defendants concerning the alleged fraud, including the instigation of a routine teleconference to discuss the issue.

■ Conversely, the confidential witnesses referenced in the CCAC *do not* specifically detail what the Individual Exchange Act Defendants knew, when they learned it, or from whom. Plaintiffs rely primarily on the testimony of "CW–3," a BioScrip employee who witnessed significant cash flow problems in PBM Services throughout 2013, including delayed payments to vendors. *See* CCAC ¶ 113. But nothing in his or her testimony suggests that the Individual Exchange Act Defendants were aware of these problems. The CCAC provides testimony from other witnesses suggesting that "corporate management" was "pretty involved" in managing PBM Services, *id.* ¶ 115, and that management was "aware of everything that was going on." *Id.* These statements are far too vague to adequately allege that the

Individual Exchange Act Defendants had *specific* knowledge about the falsity of their statements. Allegations premised on the testimony of confidential sources "must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient." *Glaser v. The9, Ltd.,* 772 F.Supp.2d 573, 591 (S.D.N.Y.2011) (citing *Campo v. Sears Holdings Corp.,* 371 Fed.Appx. 212, 217 (2d Cir.2010)).

Finally, Plaintiffs point to the testimony of another confidential witness who claimed that the Individual Exchange Act Defendants "would often receive reports on the PBM segment." *Id.* This again is insufficient. The source's testimony does not allege the content of the reports, the date of the reports, or whether the Individual Exchange Act Defendants ever read the reports. *See Campo,* 371 Fed.Appx. at 216 (affirming dismissal where confidential witness' testimony did not detail whether the reports contained information about the alleged misstatements or that defendants actually read the reports). *See also In re Citigroup Inc. Sec. Litig.,* 753 F.Supp.2d 206, 245 (S.D.N.Y.2010) ("Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company; these assertions are too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity."); *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce,* 694 F.Supp.2d 287, 299 (S.D.N.Y.2010) ("Plaintiffs should, but do not, provide specific instances in which Defendants received information that was contrary to their public

declarations."); *Local No. 38,* 724 F.Supp.2d at 461 ("a close examination of [the CWs'] statements reveals the absence of any allegation that such data had been presented to management around the time of Defendants' allegedly misleading statements ... [the] allegations do not establish what specific contradictory information the Individual Exchange Act Defendants received or when they received it."). Plaintiffs have therefore failed to adequately plead under Rule 9(b) as to their PBM Services allegations and thus have failed to state a claim under § 10 or Rule 10b–5 as to this separate scheme.

## II. Section 20(a) of the Exchange Act

 Plaintiffs allege control person liability under § 20(a) of the Exchange Act against Kohlberg and the Individual Exchange Act Defendants. *See* 15 U.S.C. § 78t(a); CCAC ¶¶ 247–255. In order to establish a *prima facie* case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation. *See In re Alstom SA,* 406 F.Supp.2d 433, 486 (S.D.N.Y.2005) (citing *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir. 1998)). Plaintiffs have pled a primary violation of Rule 10b–5 and § 10(b) by a controlled person, namely BioScrip and the Individual Exchange Act Defendants, thus meeting the requirements of the first element of control person liability under § 20(a).

 Plaintiffs next must allege control of the primary violator by Kohlberg or the Individual Exchange Act Defendants. For purposes of control person liability, control is defined as "the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract, or otherwise." *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1473 (2d Cir.1996) (quoting 17 C.F.R. § 240.12b–2). The power to influence managerial decisions is not the same as "power to direct the management and policies of the primary violator." *In re Tronox, Inc. Sec. Litig.,* 769 F.Supp.2d. 202, 208 (S.D.N.Y.2011) (quoting *Fezzani v. Bear, Stearns & Co., Inc.,* 384 F.Supp.2d 618, 645 (S.D.N.Y.2004)). Rather, "*[a]ctual* control is essential to control person liability." *In re Blech Sec. Litig.,* 961 F.Supp. 569, 586 (S.D.N.Y.1997) (emphasis added).

Plaintiffs have not plausibly plead control as to Kohlberg. Their argument against Kohlberg is premised on the fact that, at its zenith, Kohlberg controlled approximately 26 percent of BioScrip stock and had the right to designate two directors on BioScrip's eight-person board. CCAC ¶ 252. Plaintiffs also cite to media reports noting that, as BioScrip's largest shareholder, Kohlberg exercised "substantial influence" over BioScrip. *Id.* ¶ 208. Plaintiffs' claim on this point fails as a matter of law for this very reason.

 Substantial influence is not the same as actual control, and "[a]ctual control is essential to control person liability." *In re Blech Sec. Litig.,* 961 F.Supp. at 586. Certainly the ability to appoint a quarter of BioScrip's board and owning about a quarter of the company's common stock afforded Kohlberg a great deal of sway over BioScrip, but that alone does not rise to the level of actual control. "Minority stock ownership and the ability to appoint a minority of the board do not create power to direct management and policies, and thus do not constitute sufficient control ..." *In re Alstom SA,* 406 F.Supp.2d at 492 (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 352 F.Supp.2d 429,

458–59 (S.D.N.Y.2005) (concluding plaintiff failed to allege control where defendant possessed 30 percent of voting shares and ability to appoint three of nine board members)). *See also In re China Valves Tech. Sec. Litig.,* 979 F.Supp.2d 395, 414 (S.D.N.Y.2013) (plaintiffs failed to state a claim of control person liability where defendant had 30 percent stock ownership); *In re Deutsche Telekom AG Sec. Litig.,* 00–cv–9475 (SHS), 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002) (allegation that defendant possessed 22 percent of company's common stock and therefore possessed control of the company was a conclusory allegation insufficient to survive motion to dismiss); *Silsby v. Icahn,* 17 F.Supp.3d 348 (S.D.N.Y.2014) (allegation that defendant was largest shareholder, possessed 14 percent of common stock, and had ability to appoint two members of the board was insufficient to allege control). Therefore, the Plaintiffs' § 20(a) claim against Kohlberg must be dismissed because they have failed to allege that Kohlberg possessed actual control of BioScrip.

 The same is not the case for the Individual Exchange Act Defendants. Determining an individual defendant's liability as a control person is a "fact-intensive inquiry[ ] [that] generally should not be resolved on a motion to dismiss." *In re Tronox,* 769 F.Supp.2d at 208. Indeed, Defendants raise no counter-arguments as to whether the Individual Exchange Act Defendants possessed actual control over BioScrip. *See* Def.'s Br. at 23–25.

 The "[s]tatus of defendants as directors, 'standing alone, is insufficient to establish their control.'" *Id.* (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 05–cv–1898, 2005 WL 2148919, at *7 (S.D.N.Y. Sept. 6, 2005)). Nonetheless, "corporate officers usually are presumed to possess the ability to control the actions of their employees [and][d]irectors and officers who sign registration statements or other SEC filings are presumed to control those who draft those documents." *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.,* 928 F.Supp.2d 705, 721 (S.D.N.Y.2013) (concluding that "where a plaintiff alleges that the directors and officers participated in the alleged primary conduct, that is sufficient to state a claim for control person liability."). Because each one of the Individual Exchange Act Defendants had authority over the SEC filings at issue, *see* CCAC ¶¶ 250, 254, Plaintiffs have adequately alleged that they possessed actual control over BioScrip.[8]

Finally, it is a matter of ongoing debate in this Circuit whether culpable participation must be pled with particularity or whether it is an affirmative defense, with the burden on the defendant in establishing the absence of such participation. *See In re Parmalat Sec. Litig.,* 594 F.Supp.2d 444, 449 n. 32 (S.D.N.Y.2009) (collecting cases). Regardless, Plaintiffs have adequately alleged the Individual Exchange Act Defendants' culpable participation— each of the Defendants was responsible for reviewing BioScrip's SEC filings, *see* CCAC ¶¶ 250, 254 and thus, according to the allegations, "knew or should have known that the primary violator, over whom [they] had control, was engaging in

---

8. Plaintiffs brought both Count I, for violation of § 10(b) of the Exchange Act, and Count II, for violation of § 20(a) of the Exchange Act, against the Individual Exchange Act Defendants. In the event that the Individual Exchange Act Defendants are found liable as primary violators of § 11, they may not dupli-

catively be deemed control persons of their own conduct. *See, e.g., In re Parmalat Sec. Litig.,* 375 F.Supp.2d 278, 310 (S.D.N.Y.2005) ("Although a defendant ultimately may not be held liable as both a primary violator and a controlling person, such alternative theories of liability are permissible here.")

fraudulent conduct." *Lapin v. Goldman Sachs Grp., Inc.*, 506 F.Supp.2d 221, 247 (S.D.N.Y.2006). Accordingly, Plaintiffs are able to state a control person claim under § 20(a) as against the Individual Exchange Act Defendants, but not Kohlberg.

### III. Sections 11 and 12(a)(2) of the Securities Act

#### A. Applicable Legal Standards

"Section 11 creates a right of action for 'any person' acquiring a security offered pursuant to a misleading registration statement." *In re Initial Pub. Offering Sec. Litig.*, 241 F.Supp.2d 281, 344 (S.D.N.Y.2003) (citing 15 U.S.C. § 77k(a)). "To allege a claim under Section 11 of the Securities Act, a plaintiff need show that a registration statement: (1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statement therein not misleading." *Arfa v. Mecox Lane Ltd.*, 10–cv–9053, 2012 WL 697155, at *4 (S.D.N.Y. Mar. 5, 2012) *aff'd*, 504 Fed.Appx. 14 (2d Cir.2012) (citing *Caiafa v. Sea Containers Ltd.*, 525 F.Supp.2d 398, 408 (S.D.N.Y.2007)). Section 12(a)(2) "imposes liability under similar circumstances on issuers or sellers of securities by means of a prospectus." *Litwin*, 634 F.3d at 715.

Because intent to defraud is not an element of a § 11 or 12(a)(2) claim, " 'only a material misstatement or omission [in a registration statement] need be shown to establish a prima facie case ...' " *In re Initial Public Offering*, 241 F.Supp.2d at 343 (citation omitted). *See also In re CINAR Corp. Sec. Litig.*, 186 F.Supp.2d 279, 306 (E.D.N.Y.2002) ("[A] plaintiff does not need to allege the manner in which a material misstatement on a securities filing was made—innocently, negligently, fraudulent-

ly or otherwise—because § 11 provides for strict liability.") (citation omitted).

However, in assessing Securities Act claims, courts within the Second Circuit must conduct a preliminary analysis of the claims in order to determine the appropriate pleading standard to apply. If a plaintiff's Securities Act claims sound in fraud, they are subject to the heightened pleading standard of Rule 9(b). *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir.2014) (citing *Rombach*, 355 F.3d at 171). In this case, Plaintiffs have staked their Securities Act claims upon the same factual allegations as their Rule 10b–5 claims and accordingly Rule 9(b) applies. *See also Hutchison*, 647 F.3d at 484.

#### B. The Civil Investigative Demand and BioScrip's Legal Compliance Statements

In order to state a claim under the Securities Act, a complaint "must allege a misstatement or omission of fact." *Fait v. Regions Fin. Corp.*, 712 F.Supp.2d 117, 121 (S.D.N.Y.2010) *aff'd*, 655 F.3d 105 (2d Cir.2011). "The test for whether a statement is materially misleading under § 12(a)(2) is identical to that under § 10(b) and § 11: whether representations, viewed as a whole, would have misled a reasonable investor." *See Rombach*, 355 F.3d at 178 (citing *I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir.1991)). Additionally, Plaintiffs' allegations with respect to their § 11 and 12(a)(2) claims are materially identical to those under Rule 10b–5 and § 10(b), as Plaintiffs cite the same Form 10–Q and Form 10–K statements as evidence that BioScrip misstated or omitted material facts related to the CID and the government investigation into Novartis' Exjade sales practices. Moreover, these misstatements went uncorrected until after both

the April 2013 and August 2013 offerings. *See* CCAC ¶¶ 296–306; 311–315. Accordingly, the Court again concludes that these statements were materially misleading and that Plaintiffs have, subject to the standing issue discussed below, stated a claim under § 11 and § 12(a)(2) of the Securities Act as to BioScrip, the Underwriter Defendants, and the Individual Securities Act Defendants. *See supra* Section I.A.I.

## C. PBM Services

 For the PBM Services segment, Plaintiffs point to the following disclosure in BioScrip's April 16, 2013 prospectus supplement as evidence of a misstatement.

> The loss of a relationship with one or more of our discount card brokers could negatively impact our business. We contract with over 80 marketing companies that provide pharmacy discount cards to the uninsured and underinsured. Depending on the amount or revenue generated by any broker agreement, one or more terminations could have a material and adverse effect on our consolidated financial statements. The brokers we use are typically small, privately held marketing companies. The two largest brokers generate a significant percentage of the discount card business. We are unaware of any intention by a significant discount card broker to terminate or not renew an agreement with us.

CCAC ¶ 308.

For the same reasons discussed above, Plaintiffs have adequately alleged that it was a misstatement for BioScrip to suggest that it was unaware of any broker's intention to terminate or not renew an agreement with BioScrip, in light of the fact that weeks earlier BioScrip had lost a client that provided nearly *one third* of their PBM Services revenue.[9] The Underwriter Defendants point to *Steinberg v. PRT Grp., Inc.*, 88 F.Supp.2d 294, 308 (S.D.N.Y.2000), in which the Court concluded that it was not misleading for a prospectus to predict potential future revenue based on outstanding bids because the prospectus "did not make any specific representations that [defendant] had received or was expecting to receive any … business from the" bids. *Id.* at 309. But while that case concerned forward-looking statements bound with cautionary language, this case concerns allegations of what was, by April 16, 2013, already a *fait accompli*—BioScrip's loss of a client providing a significant portion of its PBM Services revenue.

More analogous to this case is *Milman v. Box Hill Sys. Corp.*, 72 F.Supp.2d 220, 231 (S.D.N.Y.1999), where the court rejected a defendant's argument that "the securities laws do not require a company to disclose information regarding sales results for a quarter in progress." The plaintiffs in that case alleged that, prior to the issuer's public offering, the defendants had knowledge of a trend that had already had a material negative impact on the issuer's net sales. The Court concluded that "hypothetical warnings will not eliminate liability based on the failure to disclose present knowledge." *Id.* As in *Milman,* the loss of a major PBM Services client was not a hypothetical problem for BioScrip, but rather a present reality that had tremendous impact on the segment's bottom line. Accordingly, in light of the fact that Securities Act claims do not require pleadings of scienter, the Plaintiffs have adequately stated a claim under both § 11 and § 12(a)(2) as to the April 2013 offering and its representations concerning the state of BioScrip's PBM Services segment.

---

9. *See supra* Section I.B.1.

■ The prospectus for the August 2013 offering did not contain an analogous statement about the potential harm PBM Services would suffer from the loss of a major broker client. Moreover, by the time of the offering, on August 13, 2013, BioScrip's loss of this major client was public knowledge due to BioScrip's own disclosure on August 7, 2013. *See* CCAC ¶¶ 120–122. Similarly, as already explained, BioScrip's other statements regarding decreases in discount card volume were not misleading.[10] Accordingly, Plaintiffs have failed to state a claim with respect to the August 2013 offering.

## D. Standing

The Underwriter Defendants challenge Plaintiffs' standing to bring § 12(a)(2) claims related to both the April 2013 and August 2013 offering and also § 11 claims arising from the August 2013 offering specifically.

■ Section 12(a)(2) only applies to transactions stemming from a public offering of a security and accordingly "a Section 12(a)(2) action cannot be maintained by a plaintiff who acquires securities through a private transaction, whether primary or secondary." *Yung v. Lee*, 432 F.3d 142, 149 (2d Cir.2005) (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 584, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)). Moreover, the Supreme Court has explained that § 12(a) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Pinter v. Dahl*, 486 U.S. 622, 644 n. 21, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). Final-

ly, a plaintiff may only bring a claim against a "statutory seller" from which it "purchased" a security "pursuant to" the pertinent offering documents. *See In re MF Global Holdings Ltd. Sec. Litig.*, 982 F.Supp.2d 277, 323 (S.D.N.Y.2013) (citing *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F.Supp.2d 258, 311 (S.D.N.Y.2011)).[11] In sum, Plaintiffs must allege that they made a direct purchase of a security from a statutory seller as part of a public offering.

### 1. The April 2013 Offering

■ Plaintiff West Palm alleges that it purchased BioScrip stock "throughout the Class Period and pursuant or traceable to the Company's April 19, 2013 public offering." CCAC ¶ 30. It also attaches a schedule to the complaint indicating that it purchased 3,450 shares of BioScrip common stock on the day of the April 2013 offering. CCAC, Ex. B. Plaintiff Fresno alleges only that it purchased BioScrip stock "[d]uring the Class Period," CCAC ¶ 29, and similarly attaches a schedule of purchases to the complaint. CCAC, Ex. B.

Plaintiffs do not appear to contest Fresno's lack of standing to bring a § 12(a)(2) claim. This is not unreasonable in light of the fact that courts consistently find a lack of § 12(a)(2) standing where plaintiffs merely allege that they purchased stock "during the class period." *See, e.g., In re Fairway Grp. Holding Corp. Sec. Litig.*, 14–cv–0950 (LAK), 2015 WL 249508, at *19 (S.D.N.Y. Jan. 20, 2015) (lack of standing where plaintiff only alleged that they "purchased shares of Fairway securities

---

10. *See supra* Section I.B.1.

11. An individual qualifies as a "statutory seller" if he: (1) "passed title, or other interest in the security, to the buyer for value," or (2) "successfully solicit[ed] the purchase [of a

security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner." *Pinter*, 486 U.S. at 642, 108 S.Ct. 2063.

during the Class Period," because this failed to allege they purchased stocking during company's IPO).

Whether West Palm has standing presents a substantially closer call. Courts within this district have been appropriately wary of allegations that a plaintiff purchased a security "pursuant or traceable to" an offering, as compared to simply "pursuant to an offering," because it is ambiguous whether the plaintiff is alleging they were a direct or indirect purchaser. *See, e.g., In re Ultrafem Inc. Sec. Litig.,* 91 F.Supp.2d 678, 694 (S.D.N.Y.2000) (explaining distinction between purchasing "pursuant to an offering" as compared to "pursuant or traceable to an offering"); *In re Cosi, Inc. Sec. Litig.,* 379 F.Supp.2d 580, 589 (S.D.N.Y.2005) (dismissing § 12(a)(2) claim where plaintiff purchased security "pursuant or traceable" to the offering); *Tsereteli v. Residential Asset Securitization Trust 2006–A8,* 692 F.Supp.2d 387, 391 (S.D.N.Y.2010) (finding standing where plaintiff purchased security "pursuant to an offering" and suggesting in *dicta* that plaintiff "likely would not have standing had they alleged only that they purchased the Certificates "pursuant or traceable to" the offering"); *Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co. Inc.,* 714 F.Supp.2d 475, 484 (S.D.N.Y.2010) (dismissing complaint where plaintiffs "rather coyly" alleged only that they purchased certificates "pursuant and/or traceable" to the offering).

■ However, West Palm also presents a schedule indicating it purchased BioScrip stock on the day of the April 2013 offering. The Underwriter Defendants contend this is inadequate, as they do not allege specifically *which* underwriter sold stock to West Palm. However, courts do "not require that the putative class representative identify the specific underwriter from which it purchased shares as long as

the allegations are sufficient." *Perry v. Duoyuan Printing, Inc.,* 10–cv–7235 (GBD), 2013 WL 4505199, at *12 (S.D.N.Y. Aug. 22, 2013) (collecting cases).

Nonetheless, at least one decision within the Southern District of New York suggests that simply providing a schedule indicating a securities purchase on the day of the offering is inadequate because such schedules do "not make clear whether [the plaintiff] purchased the shares directly or in a secondary market "traceable" to the offering." *See In re UBS AG Sec. Litig.,* 07–cv–11225 (RJS), 2012 WL 4471265, at *27 (S.D.N.Y. Sept. 28, 2012). Other opinions have come out the other way. *See In re Lehman Bros. Sec. & Erisa Litig.,* 799 F.Supp.2d at 311 (standing existed where plaintiffs alleged they purchased a certain number of securities on the day of the offering).

In this case, West Palm's attached schedule further claims to specify which purchases of BioScrip stock were through "direct participation in a secondary offering," CCAC, Ex. B, and indicates that the April 19, 2013 purchase was, in fact, the result of direct participation in the offering. Construing this allegation to be true, the Court concludes that West Palm has adequately alleged that it was a "direct" purchaser and thus has standing to bring a § 12(a)(2) claim as to the April 2013 offering.

### 2. The August 2013 Offering

■ The Underwriter Defendants are correct in noting that the amended complaint "refutes any contention that Plaintiffs purchased shares in the August 2013 Offering." *See* Underwriter Def.'s Br. at 22. Simply put, nothing in either schedule put forward by the Plaintiffs suggests that they purchased BioScrip stock through direct participation in the August 2013 offering. *See* CCAC, Exs. A, B. Accordingly, Plaintiffs have failed to state a § 12(a)(2) claim as to the August 2013 offering.

### 3. Section 11 Standing

The Underwriter Defendants also contend that neither Plaintiff has standing to sue under § 11 with respect to the August 2013 Offering. Standing under § 11 varies from § 12(a)(2). For instance, the Second Circuit has explicitly held that "aftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue under § 11 of the 1933 Act." *Perry v. Duoyuan Printing, Inc.,* 10–cv–7235 (GBD), 2013 WL 4505199, at *10 (S.D.N.Y. Aug. 22, 2013) (citing *DeMaria v. Andersen,* 318 F.3d 170, 178 (2d Cir.2003)). Accordingly, to establish standing under § 11 at the motion to dismiss stage, Plaintiffs need only assert that they purchased shares "issued pursuant to, or traceable to the public offerings." *Id.* (citing *In re: WRT Energy Sec. Litig.,* 75 Fed.Appx. 839 (2d Cir.2003)). Both Fresno and West Palm have alleged that they purchased BioScrip stock pursuant to or traceable to the August 2013 offering. *See* CCAC ¶¶ 320, 327. While Courts have rejected such language as being adequate to assert standing in the § 12(a)(2) context, such is not the case with § 11 claims. *See also In re Alcatel Sec. Litig.,* 382 F.Supp.2d 513, 530 (S.D.N.Y.2005). Both Plaintiffs have therefore adequately alleged standing with respect to their § 11 claims.

### IV. Section 15 of the Securities Act

Section 15 imposes joint and several liability on "[e]very person who, by or through stock ownership, agency, or otherwise … controls any person liable under" § 11. *In re Lehman Bros. Mortgage–Backed Sec. Litig.,* 650 F.3d 167, 185 (2d Cir.2011) (citing 15 U.S.C. § 77o(a)). To establish § 15 liability, a plaintiff must show a "primary violation" of § 11 and control of the primary violator by defendants. *See ECA & Local 134 IBEW,* 553

F.3d at 207; *see also In re Morgan Stanley Info. Fund Sec. Litig.,* 592 F.3d at 358. Plaintiffs have adequately plead a primary § 11 violation as to both the April 2013 and 2013 offerings and therefore the only additional question is whether the facts alleged permit an inference that the Individual Securities Act Defendants and Kohlberg controlled the primary violators.

Section 15 is a parallel provision to § 20(a) and their "terms are interpreted in the same manner." *In re Refco, Inc. Sec. Litig.,* 503 F.Supp.2d 611, 660 (S.D.N.Y. 2007) (citing *In re Global Crossing, Ltd. Sec. Litig.,* 322 F.Supp.2d 319, 349 (S.D.N.Y.2004)). The only significant distinction is that § 20(a) carries with it the added element of culpable participation by the control person. *Id.* Accordingly, Plaintiffs' claim against Kohlberg for § 15 control person liability fails for the same reason as their claim under § 20(a)—they have not adequately alleged *actual* control by Kohlberg. *See supra* Section II. Likewise, Plaintiffs *are* able to maintain claims against the Individual Securities Act Defendants, although this includes a greater number of individual defendants than the Individual Exchange Act Defendants. Nonetheless, as already stated, determining an individual defendant's liability as a control person is a "fact-intensive inquiry[ ] [that] generally should not be resolved on a motion to dismiss." *In re Tronox,* 769 F.Supp.2d at 208. Defendants again raise no arguments as to whether the Individual Securities Act Defendants possessed actual control over BioScrip. As corporate officers and directors, they are presumed to possess the ability to control those who draft SEC filings. *See City of Westland Police & Fire Ret. Sys.,* 928 F.Supp.2d at 721. Because each one of the Individual Securities Act Defendants signed the Shelf Registration Statement responsible for the April 2013 and August 2013 offerings, CCAC ¶¶ 257; 260–268, Plaintiffs have adequately

alleged that they possessed actual control over BioScrip.[12]

## V. CONCLUSION

In sum, both motions to dismiss are GRANTED IN PART and DENIED IN PART. The motion to dismiss the Plaintiffs' Exchange Act claims under § 10(b) is DENIED as to the statements and omissions concerning the CID and BioScrip's legal compliance, but is GRANTED as to those statements concerning PBM Services. The motion to dismiss Plaintiffs' § 20(a) claims is GRANTED as to Kohlberg, but DENIED as to the Individual Exchange Act Defendants. The motion to dismiss Plaintiffs' § 11 claims under the Securities Act is GRANTED with respect to the PBM Services allegations related to the August 2013 offering, but otherwise DENIED. The motion to dismiss the Plaintiffs' § 12(a)(2) claims is DENIED with respect to Plaintiff West Palm's allegations as to the April 2013 offering, but GRANTED as to Plaintiff Fresno's allegations to the same offering. Similarly, the motion is GRANTED as to both Plaintiffs' allegations concerning the August 2013 offering. Finally, the motion to dismiss Plaintiffs' control person claims under § 15 of the Securities Act is DENIED as against the Individual Security Act Defendants, but GRANTED as to Kohlberg.

An Initial Pretrial Conference will be scheduled by separate order. This resolves Dkt. Nos. 41 and 45.

SO ORDERED.

---

12. As already explained, Defendants may not be doubly liable as both controlled and controlling persons. Plaintiffs brought both Count III, for violation of § 11 of the Securities Act, and Count V, for violation of § 15 of the Securities Act, against the Individual Securities Act Defendants. In the event that the Individual Securities Act Defendants are found liable as primary violators of § 11, they may not duplicatively be deemed control persons of their own conduct. *See, e.g., In re Parmalat Sec. Litig.,* 375 F.Supp.2d at 310.