# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gerald E. Byers, :
                Petitioner :
       :
           v. : No. 227 C.D. 2020
       :
Pennsylvania Department of Banking :
and Securities, Bureau of Securities :
Compliance and Examinations, :
              Respondent :


Dale L. Martin, :
                Petitioner :
       :
           v. : No. 229 C.D. 2020
       : Argued: March 17, 2021
Pennsylvania Department of Banking :
and Securities, Bureau of Securities :
Compliance and Examinations, :
              Respondent :


BEFORE:     **HONORABLE P. KEVIN BROBSON,** President Judge
                 **HONORABLE RENÉE COHN JUBELIRER,** Judge
                 **HONORABLE ANNE E. COVEY,** Judge
                 **HONORABLE MICHAEL H. WOJCIK,** Judge
                 **HONORABLE CHRISTINE FIZZANO CANNON,** Judge
                 **HONORABLE ELLEN CEISLER,** Judge
                 **HONORABLE J. ANDREW CROMPTON,** Judge


**OPINION BY**
**JUDGE COHN JUBELIRER**               **FILED: June 24, 2021**


       Gerald E. Byers (Byers) and Dale L. Martin (Martin) petition for review[1] of

an Order of the Pennsylvania Banking and Securities Commission (Commission)

---

[1] By Order dated August 11, 2020, the Court consolidated Byers' and Martin's appeals.

dated January 30, 2020, which adopted a Department of Banking and Securities (Department), Bureau of Securities Compliance and Examinations hearing examiner's proposed report (Report) and order concluding that Byers and Martin were "affiliates" of Trickling Springs Creamery, LLC (TSC) and, therefore, were personally liable for TSC's violations of the Pennsylvania Securities Act of 1972 (1972 Act).[2] Specifically, the Commission found Byers and Martin liable, along with TSC and its two other shareholders, for, *inter alia*, 175 violations of Section 401(c) of the 1972 Act, 70 P.S. § 1-401(c), and jointly and severally liable for the $4,375,000 administrative assessment corresponding to those violations.

On appeal, Byers and Martin argue that the Commission erred by concluding that they were "affiliates" of TSC as that term is defined by Section 102(b) of the 1972 Act, or "person[s] that directly, or indirectly through one or more intermediaries, control[led] . . . [TSC]." Section 102(b) of the 1972 Act, 70 P.S. § 1-102(b). Byers and Martin maintain that the Commission improperly imputed to them the power of others to "control" TSC and that, upon evaluation of their individual involvement in TSC, neither Byers nor Martin "controlled" TSC such that they should be liable for TSC's conduct. Because there is sufficient evidence supporting the Commission's conclusion that Martin "controlled" TSC, we affirm the Commission's Order that Martin is an "affiliate" of TSC. However, we reverse the Commission's Order that Byers is an "affiliate" of TSC because there is not substantial evidence to support the conclusion that he "controlled" TSC.

## I.    The Department's Report

On November 30, 2018, the Department filed an Order to Show Cause charging TSC and its four shareholders – Philip E. Riehl (Riehl), Byers, Martin, and

---

[2] Act of December 5, 1972, P.L. 1280, *as amended*, 70 P.S. §§ 1-101—1-703.1.

Elvin M. Martin (E. Martin) (collectively, "Individual Shareholders") – under the 1972 Act. (Report at 2.) The Order to Show Cause alleged TSC and the Individual Shareholders offered and sold promissory notes (Notes) without having registered them in willful violation of Section 201 of the 1972 Act, 70 P.S. § 1-201. (*Id.*) In addition, the Order to Show Cause alleged that TSC and the Individual Shareholders willfully violated Section 401(b) of the 1972 Act, 70 P.S. § 1-401(b), by omitting material facts during the offer and sale of the Notes that were necessary so as not to mislead potential investors. (*Id.*) Last, the Order to Show Cause alleged that TSC and the Individual Shareholders willfully violated Section 401(c) of the 1972 Act, 70 P.S. § 1-401(c), by engaging in acts during the offer and sale of the Notes that operated or would operate as a fraud or deceit upon potential investors. TSC and the Individual Shareholders answered the Order to Show Cause and requested a hearing.

The Commission held a hearing on July 17 and 18, 2019, where the parties presented their cases with testimonial and documentary evidence. Following post-hearing briefing, the Department's hearing examiner issued a Report, which the Commission adopted except as otherwise noted.

The Commission found the following relevant facts, which are not in dispute. TSC, a Pennsylvania limited liability company, was engaged in the business of processing and selling dairy products. (Report, Findings of Fact (FOF) ¶¶ 1, 2.) TSC is owned by four shareholders – Riehl, Byers, Martin, and E. Martin – and each shareholder served on TSC's Board of Directors (Board). (*Id.* ¶¶ 3-6, 8.) Riehl owns 58% of TSC and has been in control of TSC's financial records since 2007. (*Id.* ¶ 4.) Byers owns 18% of TSC and was an original owner of the company when it was formed in 2000. (*Id.* ¶ 3.) Martin owns 2.5% of TSC and served as the company's Chief Operating Officer (COO). (*Id.* ¶ 5.) E. Martin owns 20% of TSC. (*Id.* ¶ 6.)

In 2015, Riehl conceived of a plan to sell Notes in TSC to the Mennonite community, of which the Individual Shareholders are members, in order to raise capital. (*Id.* ¶¶ 7, 45.) Between 2015 and 2017, TSC offered and sold at least 175 Notes to at least 110 investors within the United States for an aggregate amount of at least $7,803,829, and it offered and sold at least 20 Notes to at least 15 Pennsylvania residents for an aggregate amount of at least $963,104. (*Id.* ¶ 47.) TSC represented to potential investors that it was issuing the Notes to obtain additional capital to be used "for whatever purpose in the business for which [] TSC required funds." (*Id.* ¶ 49.) During the years TSC marketed and issued the Notes, TSC was insolvent. (*Id.* ¶¶ 81-84.) TSC's shareholders did not register the Notes with the Department, they did not use any offering materials to promote the sale of the Notes and, except in limited circumstances, they failed to provide any formal disclosures to investors. (*Id.* ¶¶ 53-55.)

Riehl, a tax accountant with over two decades of practice experience, prepared TSC's yearly balance sheets with the assistance of TSC employees. (*Id.* ¶¶ 9, 11.) From 1995 until July 2018, Riehl borrowed funds from investors (Riehl Investors) and loaned those funds to others (Riehl Loan Program). (*Id.* ¶ 13.) Riehl commingled his personal assets with the funds he borrowed from the Riehl Investors, purchasing in 2007 his ownership interest in TSC using funds he borrowed from the Riehl Investors, which "effectively increas[ed] the number of [] TSC's debtors." (*Id.* ¶¶ 16, 19.) From 2008 until 2014, TSC borrowed over $2,000,000 from the Riehl Loan Program and Riehl in order to meet its payroll obligations. (*Id.* ¶¶ 21, 52.) A majority of the Notes that TSC sold "simply took the debt [Riehl] owed to the Riehl Investors and transferred [it] to [] TSC, thereby eliminating [Riehl's] personal liability to the Riehl Investors without [Riehl] making any of the Riehl Investors

aware of it." (*Id.* ¶ 66.) TSC received no additional capital when Riehl transferred his debt to TSC through the sale of the Notes. (*Id.* ¶ 67.)

Of the Individual Shareholders, Riehl "primarily dealt with the investors about the Notes." (Order, Reproduced Record (R.R.) at 431a.)[3] When funds came in from the sale of the Notes, Riehl would pass the funds to Martin. (FOF ¶ 57.) In addition to his majority ownership of TSC, Riehl was also the majority owner of TSC Property Management, LLC, which owned real estate that it leased to TSC. (*Id.* ¶¶ 60-61.) Notes receivable from TSC Property Management listed as assets on TSC's 2015 and 2016 balance sheets did not really exist. (*Id.* ¶¶ 62-63.)

Byers has 10 years of formal schooling and, for 30 years, operated a small trucking business delivering, *inter alia*, products for TSC. (*Id.* ¶ 34.) TSC regularly reimbursed Byers for maintenance expenses his trucking business incurred, and he was reimbursed before Note holders were paid. (*Id.* ¶¶ 35-36.) Byers invested personal funds in TSC as capital contributions. (*Id.* ¶ 37.) Beginning in 2015, as a paid employee of TSC, Byers was actively involved in TSC's operations – "running the processing plant, delivering product, making ice cream, and participating in all daily aspects of the business except what went on in the front office." (*Id.* ¶¶ 38-

---

[3] This is an instance where the Commission failed to adopt one of the hearing examiner's proposed Findings of Fact. The Commission deleted the hearing examiner's proposed Finding of Fact 51 and replaced it with the following:

> Although it was [] Riehl's idea to start selling the Notes . . . and he was the owner who primarily dealt with the investors about the Notes . . . [] Martin would sign all of the Notes . . . and Riehl was in constant communication with [] Martin as far as decisions and so on for the ongoing operations.

(Order, R.R. at 431a.) The only other instance of the Commission revising the hearing examiner's proposed Report and Order is its amendment to the proposed Order acknowledging TSC's filing of a bankruptcy petition, which operated to stay enforcement of the Commission's assessment against TSC. (*Id.*)

5

39.) Byers attended Board meetings that occasionally involved discussions about finances, "but he was not involved in the financial end of [] TSC, which he left up to [] Riehl and [] Martin." (*Id*. ¶ 40.) Byers was in Tasmania from October 2015 through March 2016, which is when TSC began selling the Notes, and, while he "knew there were some Notes being handled, he had no role in the sale of the Notes, but neither did he take any steps to find out what was going on." (*Id*. ¶¶ 69-70.)

Martin, who has a high school diploma and no formal education in finance, served as TSC's COO, which involved reading through and helping analyze TSC's financial reports; however, Riehl and TSC employees "actually prepared [] TSC's yearly balance sheets." (*Id*. ¶¶ 9, 42.) Martin supplied equipment to TSC since 2001 and, since 2015, Martin owned Agri-Services, LLC (Agri-Services), an agricultural-related business that was one of TSC's suppliers. (*Id*. ¶ 42.) Martin borrowed money to fund loans to TSC, but he did not document those loans. (*Id*. ¶¶ 43-44.) At the time Riehl conceived of the idea of selling the Notes, Martin had access to TSC's QuickBooks file "so he could be informed about [] TSC's financial condition." (*Id*. ¶¶ 45-46.) Martin was unaware of what financial information Riehl provided to potential TSC investors, but he understood that Riehl was providing some information. (*Id*. ¶ 56.) Upon receiving funds from the sale of the Notes, Riehl would send them to Martin, "who would issue the Notes with his signature on them." (*Id*. ¶ 57.)

Between July 2015 and March 2018, TSC paid Agri-Services $921,804.07, but Agri-Services only invoiced TSC in the amount of $668,502.57. (*Id*. ¶¶ 74-76.) From December 2015 until February 2018, Riehl received $938,250 from TSC for payment of short-term loans, Byers received $31,688 from TSC for reimbursement of monies he expended on behalf of TSC, and Martin received $40,000 as repayment

6

of short-term loans. (*Id.* ¶ 77.) After TSC stopped offering and selling Notes in October 2017, Riehl and Martin diverted incoming investor funds to Agri-Services because "they viewed the investors sending the funds to [] TSC as a 'mistake.'" (*Id.* ¶ 78.) In some instances during 2017 and 2018, Riehl offered individuals that wished to invest in TSC the option to instead invest in Agri-Services, and Riehl sent those funds to Agri-Services, with Martin issuing the investors a Note from Agri-Services. (*Id.* ¶ 79.)

TSC's Board met "about three times a year" where it discussed major decisions; "any major decision was supposed to be discussed at a Board meeting." (*Id.* ¶ 10.) Discussions about the need for funds occurred at Board meetings. (*Id.* ¶ 32.)

Based on these factual findings, the Commission concluded that the Individual Shareholders had "control over" TSC and, therefore, are "affiliates" of TSC that caused the business to commit acts which violated the 1972 Act. (Report, Conclusions of Law ¶¶ 3-6.) Specifically, the Commission determined that Byers and Martin had "control" over TSC based on the 1972 Act's definition of that term because each shareholder had the "power to direct or cause the direction of the management and policies" of TSC. (Report, R.R. at 462a.) According to the Commission, the evidence adduced at the hearing established that Byers and Martin "had some element of control of [] TSC[,]" and from this conclusion "flows the additional conclusion that" Byers and Martin are each an "affiliate" of TSC. (*Id.* at 462a-63a.) As "affiliates," Byers and Martin "were responsible for the actions of [] TSC" and, therefore, they willfully violated the following sections of the 1972 Act: (1) Section 201, which makes it unlawful to offer or sell any security in the Commonwealth unless it is registered, exempt, or federally-covered; (2) Section

7

401(b), which makes it unlawful in connection with the offer, sale, or purchase of any security in the Commonwealth to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they are made, not misleading"; and (3) Section 401(c), which makes it unlawful in connection with the offer, sale, or purchase of any security in the Commonwealth "[t]o engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person." (*Id*. at 463a, 465a, 471a-72a.) In light of these violations, the Commission permanently barred Byers and Martin from numerous activities associated with offering and selling securities in Pennsylvania and held them jointly and severally liable, along with TSC and the other Individual Shareholders, for a $4,375,000 assessment pertaining to the 175 violations of Section 401(c) of the 1972 Act. (Order, R.R. at 432a-33a.)

Byers and Martin then filed the instant petitions for review with this Court.[4]

## II.  Discussion

The primary issue in this case is whether what is known as "control person liability" can attach to Byers and Martin, who are minority shareholders of TSC. Before analyzing the parties' specific arguments, we set forth the general framework that guides our decision. The Commission determined that Byers and Martin are liable for TSC's fraudulent conduct because they are "affiliates" of TSC pursuant to the 1972 Act's definition of that term, which provides:

---

[4] Our scope of review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law, or whether the necessary findings of fact are supported by substantial evidence. *Pa. Sav. Ass'n v. Dep't of Banking*, 523 A.2d 837, 839 (Pa. Cmwlth. 1987).

An "affiliate" of, or a person "affiliated" with, a specified person, means a person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the person specified.

70 P.S. § 1-102(b). The Commission identified TSC as the "specified person," (Report, R.R. at 463a), which means that the outcome of this case turns on whether Byers and/or Martin, "directly, or indirectly through one or more intermediaries," controlled TSC. 70 P.S. § 1-102(b). The 1972 Act defines "control" as

the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

70 P.S. § 1-102(g). Thus, we must decide whether Byers and/or Martin had "the power to direct or cause the direction of the management and policies" of TSC. *Id.*

A. Whether the Commission Considered Aggregated Evidence of "Control"

Byers and Martin contend that the statutory definition of "control" clearly uses the singular, not the plural, when referring to who or what may be an "affiliate." (Byers' Brief (Br.) at 15; Martin's Br. at 15.) Thus, only the control that either Byers or Martin had over TSC should be considered; the "power that other persons ha[d] over [TSC] is relevant only to prove what power Byers [and Martin] d[id] **not** have." (Byers' Br. at 16; Martin's Br. at 16 (emphasis in originals).) It follows, according to Byers and Martin, that because Riehl was the majority owner of TSC, only he controlled TSC, as "[o]nly a majority owner can control the company." (Byers' Br. at 16-17; Martin's Br. at 16-17.) Byers and Martin submit that, when considered as a whole, the 1972 Act expresses the General Assembly's intent to limit control person liability to those having the "power to direct the management and policies of

9

the wrongdoer," and an evaluation of liability should focus only on that person's power. (Byers' Br. at 17-18; Martin's Br. at 17-18.)

Byers and Martin argue that "the Commission considered the evidence of control of all of the Individual [Shareholders] in the aggregate, and not as to each [member] as a separate 'person,'" which was error. (Byers' Br. at 19; Martin's Br. at 19.) Byers and Martin contend that it was error for the Commission to find that they "had the power to direct the management and policies of [TSC] when Riehl owned 58% of the company and directed the policies and management of [TSC]." (Byers' Br. at 20; Martin's Br. at 20.)[5]

We are not persuaded that the Commission considered the power of other TSC Board members in determining whether individual Board members controlled TSC. Byers' and Martin's assertion focuses on the following language from the Report: "Based on the evidence adduced at the hearing . . . each of [the Individual Shareholders] had some element of control of [] [TSC]." (Byers' Br. at 19 (quoting R.R. at 462a).) According to Byers and Martin, it follows from this statement that "the Commission considered the evidence of control of all of the [Individual Shareholders] in the aggregate, and not as to each [i]ndividual [Board member] as a separate 'person.'" (Byers' Br. at 19; Martin's Br. at 19.) However, this conclusion does not follow from the Commission's statement because, in the paragraphs prior to this statement, the Commission summarized the evidence pertaining to each **individual** Board member. After noting that all four shareholders sat on TSC's Board and thus could have been privy to discussions about its finances, the Commission stated that Martin was TSC's COO, owned 2.5% of the company, and

_____

[5] The Department does not address Byers' and Martin's argument that the Commission considered the evidence of control of all of the Individual Shareholders in the aggregate, and not as to each member as a separate person.

10

issued the Notes with his signature on them. The Commission described that Byers owned 18% of TSC, and, beginning in 2015, he participated in "all daily aspects of the business except what went on in the front office." (R.R. at 461a.) In addition, the Commission explained that while Byers was in Tasmania from October 2015 through March 2016, which coincided with when TSC began selling the Notes, he "nonetheless knew there were some Notes being handled." (*Id*.) Accordingly, the Commission did not base its decision that Byers and Martin are "affiliates" of TSC on aggregated evidence of control, but, rather, it considered the indicia of control applicable to each individual Board member.

## B. Whether Byers and Martin are Liable as Control Persons

Byers argues that evidence that he was a minority owner of TSC and one member of a four-member Board "cannot support the conclusion that [he] controlled [TSC]." (Byers' Br. at 22-23.) Martin maintains that, as TSC's COO, he was an employee that "serve[d] at the pleasure of the Board" and was "responsible [for] carry[ing] out the mandate of the Board." (Martin's Br. at 23.) According to Martin, the COO "does not have the power to determine the policies of the entity, or to decide, for example, whether to offer for sale and sell notes to raise capital." (*Id*.)

Byers and Martin contend that they simply could not have controlled TSC because there is "uncontroverted evidence that [] Riehl, alone, controlled [TSC] . . . ." (Byers' Br. at 23; Martin's Br. at 23-24.) In addition, Byers and Martin maintain that the Commission erred in concluding that because they had "some element of control" of TSC, it follows that they "controlled" TSC. (Byers' Br. at 24; Martin's Br. at 24.) "There is no explanation of how having 'some element of control' provides that person with the power to direct or cause the direction of the management and policies of [TSC]." (Byers' Br. at 24; Martin's Br. at 24-25.)

11

The Department responds that Byers and Martin had "control" over TSC based on their ownership interests, positions on the Board, and because they were involved in the daily management of TSC. (Department's Br. at 14.) Specifically, the Department contends that Byers and Martin possessed the power to direct and control the management and policies of TSC because "they knew of TSC's dire financial condition and supported Riehl in offering and selling the Notes by participating in Board meetings where TSC's finances were discussed and, specifically for [] Martin, by signing the Notes." (*Id*. at 16.) In addition, the Department argues that Byers and Martin had the "power to influence" TSC's management "through their involvement in TSC's day-to-day operations." (*Id*.) According to the Department, Martin had the power to influence TSC given his role as COO. (*Id*.)

Moreover, the Department submits that Martin's involvement with Riehl in diverting funds intended for TSC to Agri-Services shows that Martin had the "power to control the fiscal management and direction of TSC." (*Id*. at 17.) Byers had the power to direct the management and policies of TSC, according to the Department, because he served on the Board, he knew "of TSC's efforts to raise capital through the offer and sale of Notes," and he was involved in TSC's daily operations – "running the processing plant, delivering and distributing products, and making ice cream." (*Id*.)

The Department argues that Byers and Martin rely on a single, flawed argument – that a person must be a majority owner to have "control" and be deemed an "affiliate." (*Id*. at 19.) First, the Department contends that the definitions of "control" and "affiliate" are clear and unambiguous and neither definition "requir[es] a certain percentage of ownership . . . ." (*Id*.) Second, after noting that

"[t]here are no authoritative judicial precedents interpreting either the definition of 'control' or 'affiliate' under the 1972 Act," the Commission identifies three federal securities cases finding that certain minority business owners possessed "control" sufficient to hold them jointly liable for the business entity's violations of federal securities laws. (*Id*. at 19-21.)

The Department concludes that Byers' and Martin's argument that only a majority owner can have "control" "violates public policy as it significantly restricts the Department's ability to enforce the 1972 Act against individuals who commit fraud simply because they own 50% or less of the entity." (*Id*. at 25.) Because the 1972 Act is remedial in nature and designed to protect the investing public, the Department contends that it should not be hamstrung from protecting investors against fraud committed by individuals owning 50% or less of a business entity. (*Id*.)

In their joint reply brief, Byers and Martin argue that, contrary to the Department's arguments, a person does not need to be a majority shareholder to control an entity. (Byers' and Martin's Reply Br. at 1.) Instead, Byers and Martin contend that the federal cases cited by the Department, having been decided in the context of motions to dismiss, "addressed whether the facts pleaded, if true, [were] capable of establishing control person liability" but the cases "d[id] not reach the conclusion that if these facts are true that there exists control person liability . . . ." (*Id*. at 4.) Moreover, Byers and Martin submit that the Department overstates record facts and draws unwarranted conclusions. For example, Byers and Martin point out that the Department claims that Byers and Martin knew of TSC's dire financial condition when the Notes were sold, but the Commission's findings "say nothing about [TSC] being in dire financial condition," nor do they indicate that Byers and

Martin "knew that [TSC] was in poor financial condition at the time that the Notes were sold." (*Id*. at 6.) Byers and Martin point to "record evidence" suggesting that Martin and Riehl believed things were going well at TSC. (*Id*. at 6-7.) Moreover, Byers and Martin claim the Department ignores the Commission's finding that Byers was not involved in TSC's finances and "fails to distinguish between Byers and Martin with regard to the facts." (*Id*. at 7.) Further, Byers and Martin argue that the power to influence is not indicative of the power to control, and thus the Department's contention that Byers and Martin controlled TSC because they possessed the power to influence TSC by virtue of their involvement in the company's day-to-day operations is baseless. (*Id*. at 8-9.) Byers and Martin also argue that Martin's signing the Notes is not evidence of control because he "did not sign the Notes of his own volition," as "[h]e was an employee who was following the directions of his superior, [] Riehl . . . ." (*Id*. at 10.) Last, Byers and Martin suggest that the Department's argument that Byers controlled TSC because he was involved in the day-to-day creamery operations is off base because "[i]t is highly unlikely that management and policy decisions were being made by the person who was making ice cream and driving delivery trucks," and because "[m]anagement and policy decisions are 'front office' decisions," Byers could not have been involved in those decisions because the Commission found he was not involved in "what went on in the front office." (*Id*. at 11 (internal quotations omitted).)

### 1. Caselaw Interpreting the Term "Control"

There is but one Pennsylvania case addressing the concept of control, albeit the Securities and Exchange Commission's (SEC) definition of control. In *National Fuel Gas Midstream Corp. v. Department of Environmental Protection* (Pa.

14

Cmwlth., Nos. 116 and 195 C.D. 2016, filed June 2, 2017),[6] this Court held that the "power to influence" standard differs from the SEC's "control" standard. Slip op. at 22. *National Fuel Gas* involved a challenge to the Department of Environmental Protection's (DEP) decision to aggregate for air pollution control permitting purposes the emissions of two natural gas extraction and production facilities as a "single source." *Id.* DEP aggregated as a single source a natural gas compressor and processing facility owned and operated by NFG Midstream Trout Run, LLC (Trout Run) and a natural gas well pad owned and operated by Seneca Resources Corporation (Seneca). The ultimate parent of both Trout Run and Seneca is National Fuel Gas Company (NFGC). The question presented was whether Trout Run and Seneca were under "common control" of NFGC, which DEP defined by reference to the SEC's definition of "control": "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." *Id*. at 9 (emphasis omitted). The Environmental Hearing Board (EHB), reasoning that the plain meaning of "control" should govern rather than the SEC's definition of "control" that DEP utilized, concluded that Trout Run and Seneca were under "common control" of NFGC because "NFGC had the **power to influence or control** the behavior of [Trout Run] and Seneca . . . ." *Id*. at 14 (emphasis in original).

On appeal, the petitioners argued "that the EHB erred in construing the common control test by equating the power to influence decisions relevant to a facility's emissions with control of a facility." *Id*. at 18 (emphasis omitted). We agreed with the petitioners that the EHB erred in this regard, stating that "the 'power

---

[6] Pursuant to Pennsylvania Rule of Appellate Procedure 126(b), Pa.R.A.P. 126(b), and Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), an unreported opinion of this Court, while not binding, may be cited for its persuasive value.

to influence' standard used by the EHB is different than the 'control' standard found in [] DEP['s] [g]uidance, which cites to the SEC definition." *Id.* at 22. Referencing *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 308 F. Supp. 2d 249, 273-74 (S.D.N.Y. 2004), we concluded that "the term 'control' is more than the power to merely influence; it involves the power to direct." *National Fuel Gas*, slip op. at 23 (emphasis omitted). Accordingly, because the 1972 Act's definition of "control" mirrors the federal definition of "control" that we construed in *National Fuel Gas*, any attempt to equate "control" with the mere power to influence must be rejected.[7]

While there is a dearth of Pennsylvania caselaw interpreting the 1972 Act's definition of "control,"[8] there is a developed body of district court cases within the Second Circuit interpreting the term "control" found in the regulations promulgated pursuant to the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78pp. That definition provides:

> The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 240.12b-2. Because this definition is nearly identical to the 1972 Act's definition of "control," and because, by its terms, the 1972 Act "shall be so construed

---

[7] The proposition that "control" requires more than merely the "power to influence" appears to be well-established. "The power to influence managerial decisions is not the same as 'power to direct the management and policies of the primary violator.'" *In re Bioscrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 740 (S.D.N.Y. 2015) (quoting *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011)).

[8] The 1972 Act defines "control" as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." Section 102(g) of the 1972 Act, 70 P.S. § 1-102(g).

. . . to coordinate the interpretation and administration of this act with related Federal regulation," Section 703 of the 1972 Act, 70 P.S. § 1-703(a), we will consider cases from the Second Circuit in order to determine whether the Commission's conclusion that Byers and Martin are liable for TSC's conduct is in accordance with the law. While Byers and Martin correctly point out that many of these cases were decided on motions to dismiss (Byers' and Martin's Reply Br. at 4), we consider them only as persuasive authority and not as binding on this Court.[9]

Having a minority interest in a business entity and nothing more is tantamount to having only the power to influence or persuade and not the power to direct. Thus, a minority interest alone is insufficient to establish control person liability. "Minority stock ownership and the ability to appoint a minority of the board [of directors] do[es] not create power to direct management and policies, and thus do[es] not constitute sufficient control . . . ." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 492 (S.D.N.Y. 2005). *See also Silsby v. Icahn*, 17 F. Supp. 3d 348, 371 (S.D.N.Y. 2014) (allegation that defendant was largest shareholder, possessed 14% of common stock, and had ability to appoint two members of the board was insufficient to allege control); *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 414 (S.D.N.Y. 2013) (plaintiffs failed to state a claim of control person liability where defendant had 30% stock ownership); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458-59 (S.D.N.Y. 2005) (plaintiff failed to allege control where defendant possessed 30% of the voting shares and ability to appoint three of nine board members); *In re Deutsche Telekom AG Sec. Litig.*, No. 00-CIV-04750-

---

[9] Federal district court decisions may be persuasive but are not binding authority. *Stone Crushed P'ship v. Kassab Archbold Jackson & O'Brien*, 908 A.2d 875, 883 n.10 (Pa. 2006). The Court finds these cases persuasive in that if **alleging** certain facts is sufficient to deny a motion to dismiss, if those same facts are actually **found** following a hearing or trial, they would be sufficient to support the claim, as well.

SHS, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002) (allegation that defendant possessed 22% of company's common stock and therefore possessed control of the company was a conclusory allegation insufficient to survive a motion to dismiss).

What the caselaw refers to as "actual control" is "essential to control person liability." *In re Weight Watchers Int'l Inc. Sec. Litig*., No. 19-CIV-2005, 2020 WL 7029134, at *23 (S.D.N.Y. Nov. 30, 2020) (quoting *In re Blech Sec. Litig.*, 961 F. Supp. 569, 586 (S.D.N.Y. 1997)); *see also Kuhns v. Ledger*, 202 F. Supp. 3d 433, 440 (S.D.N.Y. 2016) ("Actual control, and not merely 'power to influence managerial decisions' is required."); *In re Bioscrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 740 (S.D.N.Y. 2015) ("Substantial influence is not the same as actual control," and actual control is essential to control person liability.). A person with "actual control" has the "power to direct or cause the direction of the management and policies" of the primary violator. Section 102(g) of the 1972 Act, 70 P.S. § 1-102(g).

Majority ownership is not required for a person to have "actual control" of a business entity. The court in *In re Adelphia Communications Corporation Securities and Derivative Litigation*, 398 F. Supp. 2d 244, 262-63 (S.D.N.Y. 2005), denied a motion to dismiss where plaintiffs alleged, *inter alia*, that a person with a 17% ownership interest in a business entity controlled that entity. The plaintiff in *Flag* relied on *In re Leslie Fay Companies, Inc. Securities Litigation*, 918 F. Supp. 749, 763-64 (S.D.N.Y. 1996), where control person liability was adequately alleged despite the fact that the defendants owned only 12% of the primary violator's voting shares. The court in *Flag* distinguished *Leslie Fay* because the plaintiff in *Leslie Fay*

> demonstrated that the defendants had actual control over the primary violator because plaintiff alleged that they were directors who signed fraudulent SEC filings and controlled the content of the company's

18

statements to the public. These allegations were sufficient to plead "actual control" because the defendants were in a position to direct the acts of the primary violator and could have prevented the issuance of the company's false statements.

*Flag*, 352 F. Supp. 2d at 459 (internal citations omitted). Therefore, control person liability can attach to a minority shareholder, but it will not lie against a minority shareholder absent additional "indicia of control."

"[W]here a plaintiff alleges that the directors and officers participated in the alleged primary conduct, that is sufficient to state a claim for control person liability." *City of Westland Police & Fire Ret. Sys. v. Metlife, Inc.*, 928 F. Supp. 2d 705, 721 (S.D.N.Y. 2013). That is, these allegations are "sufficient to sustain a control person claim at the motion to dismiss stage." *Emps.' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 157 (S.D.N.Y. 2011).

### 2. Whether Martin is Liable as a Control Person

We recognize that Martin owned a 2.5% interest in TSC, which is dwarfed by Riehl's ownership stake of 58%. This, however, does not preclude a finding that Martin "controlled" TSC, as control person liability can attach to a minority shareholder, provided there are additional "indicia of control." Here, "the total effect of the various indicia of control in combination[,]" *In re Leslie Fay*, 918 F. Supp. at 763, leads us to conclude that Martin controlled TSC. Martin served on TSC's Board and as the company's COO. While, generally, "officer or director status alone does not constitute control," *In re Sotheby's Holdings, Inc.*, No. 00-CIV-1041(DLC),

19

2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000),[10] we find it important that Martin was both a director and officer of TSC that participated in TSC's fraudulent conduct by signing the Notes and, with Riehl, by diverting incoming investor funds to Agri-Services, a company Martin owned. We find persuasive the cases holding that control person liability may be found where a corporate wrongdoer's directors or officers participate in the alleged primary conduct. For example, in *In re Adelphia*, the court found that control person liability was sufficiently alleged where the complaint included a number of averments regarding the alleged control person, including that he owned 17% of the company, he was chairman of the board of directors and founder of the company's parent corporation, he signed the company's annual reports, and his family owned a majority of the voting power of the company's stock, directed its affairs, and caused the company to engage in the alleged fraud. 398 F. Supp. 2d at 262. Similarly, in *In re Leslie Fay*, the court denied a motion to dismiss where the plaintiff alleged that persons with a "combined 12% non-controlling percentage of stock ownership" in a business entity controlled that entity where they also reviewed and signed SEC filings containing fraudulent financial information. 918 F. Supp. at 762-63. *See also City of Westland Police*, 928 F. Supp. 2d at 721 (finding the plaintiff sufficiently alleged a claim where executives and officers signed financial statements and attested to either possessing control over the preparers of those statements or to the statements' accuracy, allegedly made misleading statements, or otherwise participated in controlling the corporation); *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 176 (D. Conn. 2019) (finding the plaintiff stated a claim by alleging

_____

[10] *But see Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d 328, 336 (D. Conn. 2011) ("Corporate officers are usually presumed to possess the requisite power to control the actions of their employees and are often held accountable as controlling persons.").

the executive made false and misleading statements and approved and controlled the contents of the SEC filings).

Moreover, Martin had access to TSC's QuickBooks file "so he could be informed about [] TSC's financial condition[,]" (FOF ¶¶ 45-46), and he understood that Riehl was providing financial information about TSC to potential investors, (*id.* ¶ 56). Martin was thus aware of TSC's poor financial condition (the Commission found that TSC was insolvent during the years the Notes were issued (FOF ¶¶ 81-84)), and his minority ownership interest did not prevent him from informing potential investors about TSC's insolvency or from failing to cooperate with Riehl. In this regard, Martin was positioned similarly to the alleged control persons in *In re Leslie Fay*, who "were in a position to . . . prevent the commission of the fraud, but recklessly disregarded the material misstatements or omissions in the [c]ompany's . . . financial statements and in its SEC filings, press releases and other public statements . . . ." 918 F. Supp. at 764. We are not persuaded by the argument that Martin merely had the power to persuade Riehl not to move forward with marketing and issuing the Notes because he was simply "an employee who was following the directions of his superior, [] Riehl." (Byers' and Martin's Reply Br. at 10.) Martin had options other than cooperating with Riehl to commit fraud. For example, Martin could have sought legal counsel, contacted federal and/or state securities regulators, or consulted with Byers and E. Martin about how to proceed in light of Riehl's plan to sell the Notes.

In sum, because Martin served on the Board and as COO, and because he was not only knowledgeable about but participated in the financial aspects of TSC's operations, Martin "w[as] in a position to direct the acts of [TSC] and could have prevented the issuance of the company's [Notes]." *Flag*, 352 F. Supp. 2d at 459.

21

Accordingly, the evidence of record supports the Commission's conclusion that Martin "controlled" TSC and was thus an "affiliate" of TSC, liable for its fraud.

### 3. Whether Byers is Liable as a Control Person

In contrast to Martin, the evidence of record is not adequate to support the Commission's conclusion that Byers controlled TSC. According to the Department, Byers controlled TSC because he was a minority owner, he sat on the Board, and he was "aware of the offer and sale of the Notes and TSC's insolvency." (Department's Br. at 22.) In addition, the Department claims that "Byers and [] Martin both directed, actively participated in, and were aware of various day-to-day operations at TSC, which afforded them ample opportunity and ability to cause the direction and management of TSC." (*Id*.) Last, the Department contends that Byers "had access to TSC's financial records and knowledge of TSC's finances through [his] participation at Board meetings." (*Id*. at 22-23.)

However, the Department has attributed facts to Byers that only apply to Martin. First, the Commission made only two findings of fact that could be read to infer that Byers was "aware of the offer and sale of the Notes and TSC's insolvency": (1) "Byers attended Board meetings, at which there were sometimes discussions about finances and the need to obtain additional capital, but he was not involved in the financial end of [] TSC, which he left up to [] Riehl and [] Martin," (FOF ¶ 40); and (2) "[w]hile [] Byers knew there were some Notes being handled, he had no role in the sale of the Notes, but neither did he take any steps to find out what was going on," (*id*. ¶ 70). Thus, Byers knew about the Notes, but there is no indication that he knew about TSC's insolvency. Unlike Martin, who reviewed TSC's financial statements, Byers "was not involved in the financial end of [] TSC . . . ." (*Id*. ¶ 40.)

22

While the Commission found that there were "sometimes discussions about finances" at Board meetings, there is no specific evidence that Byers attended a Board meeting at which TSC's insolvency was discussed. In fact, there is no evidence whatsoever that Byers knew that TSC was in poor financial condition when the Notes were being issued. So, his general knowledge that "some Notes [were] being handled" is not terribly meaningful. In addition, the Department submits that Byers' active participation in the day-to-day operations at TSC afforded him the power to direct the management and policies of TSC. However, unlike Martin, who served as TSC's COO and was involved in the day-to-day **financial operations** of TSC, Byers' active participation in TSC involved "running the processing plant, delivering product, making ice cream, and participating in all daily aspects of the business **except what went on in the front office**." (*Id*. ¶ 38 (emphasis added).) The direction of a company's management and policies is set by the "front office" and, therefore, Byers' lack of involvement in that aspect of TSC's business does not support a finding that he had control of TSC.

The evidence supports the following about Byers' involvement in TSC: (1) he was a minority owner that sat on the Board; (2) he knew that Riehl and Martin were selling the Notes, but he was not necessarily aware of TSC's financial condition; and (3) unlike Martin, he did not participate in any aspect of TSC's fraudulent conduct. Ultimately, the Department is attempting to hold Byers liable as a control person based on his status as a minority owner and director. However, under the unique circumstances present here, where it appears that Byers left it up to Riehl and Martin to direct the financial management and policies of TSC, we cannot say that Byers "controlled" TSC merely because he held an 18% interest and participated in Board meetings.

23

The cases upon which the Department relies do not require a different result. First, in *In re Adelphia*, the purported control person, John Rigas, was like Byers in that he was not a corporate officer, but he was a minority owner and board member of the company, ABIZ. 398 F. Supp. 2d at 262. However, there were additional indicia of control that the court considered in finding the "plaintiffs' allegations sufficient to support a 'reasonable inference' that John Rigas 'had the potential power to influence and direct the activities' of ABIZ." *Id*. at 263. The additional indicia of control included that Mr. Rigas founded ABIZ's parent corporation, he signed ABIZ's Annual Reports, and his family "owned a majority of the voting power of ABIZ stock, directed the company's affairs, and caused the company to engage in the alleged fraud." *Id*. at 262. Similarly, in *In re Leslie Fay*, the purported control persons were outside directors and minority shareholders, but there were also allegations that the purported control persons signed the allegedly fraudulent documents. 918 F. Supp. at 763-64. However, unlike the purported control persons in *In re Adelphia* and *In re Leslie Fay*, beyond Byers being a minority shareholder and Board member, there are no additional indicia that he controlled TSC. The Department also relies on *In re Solucorp Industries, Ltd. Securities Litigation*, No. 98-CIV-2348 (LMM), 2000 WL 1708186 (S.D.N.Y. Nov. 15, 2000), but in that case, control person liability was sufficiently alleged based in large part on the allegation that the defendants were corporate insiders who had access to the financial aspects of the company's day-to-day business, whereas here, Byers was "not involved in the financial end of [] TSC, which he left up to [] Riehl and [] Martin." (FOF ¶ 40.)

24

## III. Conclusion

Accordingly, for the foregoing reasons, we hold that the Commission's conclusion that Martin had the "power to direct or cause the direction of the management and policies" of TSC was in accordance with the law, and thus we affirm the Commission's Order holding Martin liable for TSC's conduct as a control person. However, we reverse the Commission's Order holding Byers liable for TSC's conduct as a control person because the record evidence does not support the conclusion that he had the "power to direct or cause the direction of the management and policies" of TSC.

 

**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gerald E. Byers, : 
                Petitioner : 
                      : 
                      : 
             v. :    No. 227 C.D. 2020
                      : 
Pennsylvania Department of Banking : 
and Securities, Bureau of Securities : 
Compliance and Examinations, : 
                Respondent : 


Dale L. Martin, : 
                Petitioner : 
                      : 
             v. :    No. 229 C.D. 2020
                      : 
Pennsylvania Department of Banking : 
and Securities, Bureau of Securities : 
Compliance and Examinations, : 
                Respondent : 

# O R D E R

**NOW**, June 24, 2021, the Order of the Pennsylvania Banking and Securities Commission (Commission), dated January 30, 2020, finding that Dale L. Martin is an "affiliate" of Trickling Springs Creamery, LLC (TSC), is hereby **AFFIRMED**. However, the Commission's Order finding that Gerald E. Byers is an "affiliate" of TSC is hereby **REVERSED**.

 

_____
**RENÉE COHN JUBELIRER,** Judge